# Staunton.

## APPALACHIAN POWER COMPANY v. MITCHELL'S ADMINISTRATRIX.

September 23, 1926.

Absent, West, J.

1. NEGLIGENCE—*Joint Tort Feasors—Liability.*—A defendant in an action for negligent injury cannot escape liability for its own negligence merely by showing that another was also negligent.

2. ELECTRICITY—*Power Companies—Liability for Defective Wiring— "Within the Premises of the Consumer"—Case at Bar.*—The printed clauses of a contract, between a power company and an industrial institute, provided that all wiring and other electrical equipment "within the premises of the consumer," except the meter, were to be furnished and put in place by the consumer and kept in good condition by the consumer. It was insisted that the words "within the premises of the consumer" meant and embraced all the farm of the institute over which a special wire was constructed to supply current to a pumphouse. The words "within the premises of the consumer" appeared upon the face of the contract and there clearly referred not to the entire farm, but the premises occupied as a pumphouse which was the point of delivery.

   *Held:* That there was no reason to attribute to the words "premises" any different meaning when used in the printed rules and regulations constituting a part of the same contract.

3. ELECTRICITY—*Power Companies—Liability for Defective Wiring—Case at Bar.*—In the instant case a power company contracted to furnish power for a pumping station at an industrial institute. The contract provided that all wiring and other electrical equipment "within the premises of the consumer," except the meter, should be furnished and kept in good condition by the consumer. Under such a contract the company contracts to transmit the electric current to the building which is to be supplied with light and power. It is within these premises (here the premises occupied as a pump station) that the consumer supplies the equipment and it is this equipment for which the consumer is responsible. The clause does not apply to "construction of lines."

4. ELECTRICITY—*Power Companies—Liability of Corporation or Consumer*

*for Accident—Case at Bar.*—In the instant case plaintiff's decedent was killed by coming in contact with a wire charged with electricity. The electricity was transmitted by defendant company over a line crossing a field of an industrial institute and supplying power to a pump house owned by the institute. Defendant claimed that the institute was responsible for the death of plaintiff's intestate.

*Held:* That while questions as to the ownership, construction and maintenance of the line might arise between the institute and the defendant, neither could escape responsibility to the plaintiff for their negligence, joint or several, by reason of such questions.

5. Electricity—*Liability—Insulation—Case at Bar.*—Plaintiff's intestate was killed through contract with a guy wire which had become charged with electricity transmitted by defendant over a line crossing a field of an industrial institute, by whom decendent was employed. The uninsulated guy wire was attached to a pole about one foot above one of the uninsulated bare high power wires. The other end of the guy wire had become detached and gotten in the way of the laborers in connection with the farm work. It had been handled and pushed out of the way by others in the presence of the decedent without injury, and local employees of defendant had said as to similar guy wires that there was no danger.

*Held:* That the actual ownership of the line was of no consequence under these circumstances, because to transmit a deadly current of electricity over such carelessly constructed and unprotected wires was primary negligence on the part of the power company and this whether it owned or controlled the wires or not.

6. Electricity—*Liability for Negligence—Contributory Negligence—Case at Bar.*—In the instant case plaintiff's intestate was killed by contact with a guy wire charged with electricity. The wire had been handled several times by several persons without injury in the presence of decendent and the employees of defendant had said that there was no danger in handling such wires and it was left loosely hanging for a long time without injury to any one.

*Held:* That the question of plaintiff's contributory negligence under these circumstances was properly submitted to the jury.

7. Electricity—*Negligence—Expert Evidence.*—In the instant case, an action for death of plaintiff's intestate from contact with a guy wire highly charged with electricity, an expert witness was allowed to testify that the construction of the line was negligent. The witness described the construction fully. The defendant introduced witnesses for the purpose of showing that in their opinion there was no danger, but they testified that the construction was not standard and was not proper.

*Held:* That the testimony of the expert was properly admitted.

Error to a judgment of the Circuit Court of Montgomery county. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Robert E. Scott* and *John S. Desper*, for the plaintiff in error.

*Jordan, Roop, Sowder & Dalton*, for the defendant in error.

PRENTIS, P., delivered the opinion of the court.

John H. Mitchell was electrocuted through a guy wire, which had become charged with 2,300 volts of electricity, transmitted by the Appalachian Power Company over a line crossing a field of the Christiansburg Industrial Institute, used to supply electric power to a pump house owned by the institute. His administratrix sued the company, and there has been a judgment, based upon the verdict of a jury, in her favor.

The writ of error is being vigorously prosecuted here. The claim for the defense, which is repeatedly made and argued at length, is in substance, though not in form or legal effect, equivalent to a demurrer to the plaintiff's evidence. Much of the evidence offered for the plaintiff was excepted to, nearly if not all of the instructions which were given by the court are criticised and were excepted to, exceptions are taken because the court refused to give numerous instructions offered for the defendant company, and there was a motion to set aside the verdict of the jury and give judgment for the defendant, notwithstanding the verdict.

We shall not state the contentions so repeatedly made in varying form, except once, and then in the language of the learned attorneys for the defendant.

It is claimed for the company that there should have been a judgment by the trial court in its favor, because—

"1. The line in question was wholly on the premises of the said industrial institute, of which the decedent was the general manager, and was built to furnish power to a pump house belonging to and operated by said institute.

"2. According to the evidence of one of the witnesses called for the plaintiff, viz., the general manager of the power company, the said line was not built under the direction of the power company and was neither the property of, nor under the control of, the defendant.

"3. That the power to said pump house, conducted over said line, was furnished under a special contract in writing between the said industrial institute and the defendant power company, which defined the obligations of the parties thereto in respect to the furnishing of said power.

"4. That the said guy wire, as it was originally installed, and as it was for some time prior to the accident, and until it was moved by the employees of the institute, was perfectly safe and not liable to cause any injury to anyone.

"5. That the injury complained of, and which caused the death of the plaintiff's decedent, could not possibly have happened if said guy wire had not been, by the employees of the institute, unnecessarily and wholly unreasonably moved across the road over the fence and into the field in which the plaintiff's decedent was at the time of his death, and then presumably,

either by his own act or under his direction, carried back under the power line until it came in contact with one of the openly and obviously bare wires thereof known to be charged with a deadly current.''

Because of this view of the evidence, a motion was made to strike out the evidence of the plaintiff so far as it tended to connect the defendant with the death of the plaintiff's decedent on the following grounds:

"1. That such evidence was not responsive to the issue presented by the pleadings, and was not sufficient to establish the negligence imputed in the notice to the defendant.

"2. That the evidence showed that the proximate cause of the death of the decedent was the acts of persons other than the agents and representatives of the defendant, and was in the last analysis due to the decedent's own act and want of ordinary care.

"3. That the contracts introduced in evidence, together with the parol evidence in connection therewith, showed that the defendant company was not the owner of said power line, not responsible for its construction or maintenance, or the presence of the guy wire at the point where the decedent met his death.''

If the record supported the implications so expressed or implied, the elaborate argument based thereon would be unanswerable, but the facts which are either proved or conceded confute and destroy these arguments.

The court having overruled the motion, exception thereto was duly taken.

It is observed that a fundamental proposition which is so insisted upon is the claim that the decedent was the general manager of the institute (while the proof is that he was the manager of the farm only), and that his death was caused either by the negligence of the institute, or of the plaintiff's decedent.

[1] This apparently overlooks the fact that the defendant cannot escape liability for its own negligence merely by showing that the institute or its agents were also negligent. This takes us to the evidence.

(a) It is shown that while the decedent was the general manager of the farm, he had no duties or responsibilities whatever in connection with this power line, or with the electricity transmitted to the pump house, which belonged to and was operated by the institute.

(b) As to the construction and ownership of this portion of the line, it is shown that it is from one-half to three-quarters of a mile long; that it was built by the co-operation of the institute and the power company. The institute desired and permitted the construction, and furnished the poles, while the power company furnished the wires; assisted in the construction; transmits its power over the line, and does the ordinary repairs.

(c) The special contract in writing which is referred to, and which it is insisted the court should have construed as operating to relieve the defendant of all responsibility, is the standard contract required of all consumers. It provides for the furnishing by the company to the institute of "60 cycles, 1 phase, 110 volt electric current upon the *premises* No._____ St., Cambria, city,_____State, *occupied as a pump station.*" Printed on this contract are certain rules and regulations, which are referred to and made a part of that agreement. The portions of the rules particularly relied on are these:

"(1) The company will furnish the meter and necessary service connection to the customer's premises, which shall remain the property of the Company

and may be removed by it at any time on the termination of this agreement or the discontinuance of the service.

"All wiring and other electrical equipment or apparatus within the premises of the consumer, excepting the meter, shall be furnished and put in place by the consumer, and the company shall not be required to supply any current hereunder until such wiring, equipment and apparatus has been made to conform to the rules and requirements of the latest Code of the National Board of Fire Underwriters and those of the company.

"(2) The consumer shall at all times during the term of this agreement maintain and repair the wiring, equipment and apparatus to be furnished by the consumer as aforesaid, in such condition as may be required by the company, and by any statute, law or city ordinance, and by the rules and regulations of the National Board of Fire Underwriters.

"(3) The consumer shall not permit any one other than authorized employees of the company to interfere with the meters or other appliances of the company, and shall provide for the safekeeping of such meters and other appliances. The consumer shall insure the company against any damage or injury to the property of the company located in the premises of the consumer, which is not incurred by any act or omission on the part of the company, its agents or employees."

The farm of the institute contained about 185 acres, and upon it there was a charitable school for negroes, maintained by the Freedmen's Association of America, with headquarters at Philadelphia.

[2, 3] The insistent claim is that under rules 1 and 2 of this contract, all wiring and other electrical equip-

ment and apparatus within the premises of the consumer, except the meter, are to be furnished and put in place by the consumer, and that such equipment as is furnished by the consumer shall be kept in such condition as may be required by the company and by any statute law or any ordinance, and by the rules and regulations of the National Board of Fire Underwriters, that the company has no responsibility for any negligent injury occurring on this power line, because it was on the land of the institute. It is insisted that the words "within the premises of the consumer," used in this contract, mean and embrace all of the farm of the institute over which this special line was constructed in order to supply current to the pump house.

As has been shown, the same word, "premises," appears upon the face of the contract and there clearly the "premises" referred to are not the entire farm, but the premises occupied as a pump station, which is the point of delivery. The duty and the risk of the transmission is upon the company until it reaches the consumer for use at the delivery point. Why there should be attributed to the word "premises" any different meaning, when used in the printed rules and regulations constituting a part of the same contract, we are unable to perceive. Indeed, we are perfectly clear in our view that under such a contract as this, the company contracts to transmit the electric current to the building which is to be supplied with light and power. It is within these premises (here the premises occupied as a pump station) that the consumer supplies the equipment, and it is this equipment for which the consumer is responsible. The clause does not apply to "construction of lines," to use the language of the company's witness, Wellford. This construction of

the contract is confirmed in this case by a letter written from the general offices of the Appalachian Power Company, in Bluefield, referring to a similar previous contract to supply power to this very pump house, in response to a claim of the consumer that the company should repair the motor therein.   This is the language of the letter:

"Our lineman stationed at Christiansburg, Mr. Bolling, simply connected up this motor at your request and as a favor to you and for which no charge was made, the company not assuming any responsibility for his work.   This was explained to you at the time and you were informed that the company did no inside wiring and preferred that such work be done by outside contractors, and simply acceded to your request as a special accommodation."

[4] The rights of this plaintiff do not, however, depend upon the ownership, construction, and maintenance of the high power line through the farm to the pump house.   Questions as to this ownership may arise between the institute and the company, but neither can escape responsibility to the plaintiff for their negligence, joint or several, by reason of such questions.

[5] The parol evidence shows, without substantial contradiction, that this guy wire was attached to a pole on a curve about one foot above one of the uninsulated bare high power wires; that it, the guy wire, was also entirely uninsulated; that for years the other end of it had been attached to a post on the opposite side of one of the farm roads; that this post had rotted; that about two months before the injury this guy wire had been attached to another post nearer to the power line; that later it had become detached and had gotten in the way of the laborers in connection with their

farm work for the institute, and hung on a horse's foot; that it had been handled, pushed out of the way, by others in the presence of the decedent without injury; that local employees of the company had said as to similar guy wires that there was no danger. It is under this state of facts that the proposition is seriously urged upon us that the power company cannot, as a matter of law, be charged with negligence in permitting such a menace to human life so to continue for months, even years.

It seems to us, upon the question of the negligence of the company, the actual ownership of the line is a matter of little consequence, under these circumstances, because to transmit such a deadly current of electricity over such carelessly constructed and unprotected wires is primary negligence on the part of the company, and this whether it owned or controlled the wires or not.   It may be true that the institute is also chargeable with negligence, but that cannot relieve the company unless it was free from negligence, because joint tort feasors are equally liable.

No one knows the precise time or exactly how the guy wire was brought in contact with the transmission line, but that from the time of its construction there was constant danger of such contact with the lowest transmission wire is perfectly apparent.   There were no cross-arms, but all the wires were closely attached to the pole which carried the high power wires; so that there was always the danger of contact between the high power wire and the guy wire.   When the guy wire was removed from the rotting post to which it had been attached across this farm road, this danger was greatly increased and became still more imminent as it lay across the farm road nearly under the post, and after the horse's foot became entangled in it.

Under the evidence in this case, the company must be charged with notice of the defective original construction, of the increased and imminent peril to those whose duties required them to use that farm road both before and after the guy wire became detached, and with responsibility for transmitting the current over such a line.

With the utmost respect for the views of counsel, we cannot think it necessary to pursue this matter much further. Even if the company had succeeded in showing that the negligence of the institute was more culpable than its own negligence, this, as has been indicated, could not change the result. The transmission of twenty-three hundred volts of electricity, under these circumstances, without standard equipment, or ordinary care, to protect from such an injury as this, was its proximate cause and constitutes actionable negligence imputable to the transmitting company. As to this line on which the injury occurred, the company was at least a licensee, and as responsible for negligent construction of which it had notice and failure of maintenance which it had assumed as if it had been the absolute owner of the right of way and line.

[6] The only question in the case which, under our view of this evidence, could fairly arise, is whether or not the decedent was himself guilty of contributory negligence. When, however, we note that the wire had been handled several times by several persons without injury, that the employees of the company had said that there was no danger in handling such wires, and that it was left loosely hanging for so long without injury, it is apparent that this question was properly submitted to the jury.

[7] There is complaint that an expert witness was

allowed to testify that the construction was "negligent." It is only necessary to say, as to this, that it was described fully, that the defendant also introduced witnesses for the purpose of showing that in their opinion there was no danger, but they also confirm the evidence introduced for the plaintiff and testify that the construction was not standard and was improper. This lies within the realm of expert knowledge, and we know of no reason why the court should have excluded any of it.

The instructions, in our view of the evidence, were much more favorable to the defendant than they should have been, because they adopted the view that this defendant might escape liability if it showed that the institute owned and negligently constructed the line, or by any of its servants, or negligently caused the injury.

As we have so plainly indicated, we think the verdict is fully sustained by the evidence, and that the jury properly decided the only question about which there could have been any fair difference of opinion, namely, that decedent Mitchell had not been guilty of contributory negligence.

*Affirmed.*

*Upon a Petition for Rehearing.*

Richmond.

November 26, 1926.

PRENTIS, J., delivered the opinion of the court.

The petition for rehearing quotes two clauses in the original opinion, and bases one of its reasons for asking for a rehearing thereon.

In this connection it is asserted that these portions of the opinion are in conflict with the previously settled law in this State and in most other jurisdictions, namely, that a power company is not responsible for any alleged negligence arising out of the construction of a power line to which it merely furnishes power, but which it does not own or control.

The criticised expression was not intended to create such a conflict. So to construe it is to misconstrue it. The context shows that the opinion neither overrules nor conflicts with the recent case of *Gallaher* v. *Waynesboro Mutual Telephone Co.*, 143 Va. 383, 130 S. E. 233. The power company, in this case, has been held responsible because of its relation to the power line involved. It aided in its construction, furnished the wire, alone used it, and assumed the responsibility for its maintenance. These and the circumstances indicated in the opinion differentiate this case from the *Gallaher Case, supra*, and the line of cases so insistently relied upon.

*Rehearing refused.*