# Richmond

W. T. BARNETT V. VIRGINIA PUBLIC SERVICE COMPANY.

November 11, 1937.

Present, All the Justices.

The opinion states the case.

*Walsh & Waddell* and *Alexander H. Sands,* for the appellant.

*John S. Battle* and *Henry W. Anderson, Jr.,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

W. T. Barnett instituted this action of trespass on the case for his own benefit, as well as for the benefit of two fire insurance companies, against the Virginia Public Service Company, to recover the sum of $10,000, by reason of the destruction of his dwelling house by fire.

We will hereinafter refer to the parties as plaintiff and defendant in the respective positions occupied by them in the trial court.

The plaintiff contends that the destruction of his dwelling was due to a fire communicated from a tree ignited through contact with an electric wire, which contact was caused by the swaying of a rotten pole, from which was suspended an electric transmission line of the defendant company. The defendant denies that the fire originated as charged, and denies ownership or control of the electric line. It further contends that the plaintiff and his predecessors in title, together with certain other persons, constructed, controlled and maintained the transmission line, and that the plaintiff was guilty of contributory negligence. The jury rendered a verdict for the defendant company, and the trial court approved the verdict.

The first assignment of error is to the action of the trial court in refusing to set aside the verdict of the jury as contrary to the law and the evidence. In order to pass upon this question, and to get a fairly complete picture of the case, it is necessary that we set out, somewhat in detail, much of the evidence of the surrounding facts and circumstances.

The defendant is a light and power company engaged in distributing and handling electricity in the city of Charlottesville and Albemarle county. One of its main transmission lines extends such service from the city northwardly into Albemarle county, along what is called the Rio road.

Some ten or twelve years before the fire which destroyed the plaintiff's dwelling, a group of property owners and residents, among whom was a predecessor in title of the plaintiff, in what is called the Stony Point neighborhood of the above county, across the Rivanna river from Rio road, entered into an agreement with a power company, of which the defendant was the successor in interest and charter rights, to secure electric service. The property owners agreed that they would construct, at their own expense, an electric transmission line from the Rio road to their several properties, which line would thereafter be maintained by these owners and by those who took service from it. The power company agreed that the newly constructed line might tap its main transmission line on Rio road, and that it would furnish electricity over the new line, with a charge to the several consumers thereon, at the usual rate for the amount of electricity used by each of them. In further consideration of the fact of the construction and maintenance of the line by the individual consumers, a concession with reference to a minimum charge was made by the company to the consumers on this particular line.

No agreement with the power company was ever reduced to writing, and no rights-of-way were granted to the power company, but the surviving parties to the agreement, who testified in this proceeding, are in accord as to the terms of that agreement.

In pursuance of the agreement, the branch line from the Rio road was constructed by the property owners. The evidence shows that, from the time of such construction, it was maintained wholly by the property owners, who received the service, and over whose land it extended. Neither the original power company, nor its successor, the defend-

ant here, appear to have exercised any control over the line, or to have repaired it in any way, except at the request and at the cost of the property owners and consumers. Newer residents of the neighborhood desirous of securing electric service over the extension line applied to the former residents and owners of the line for such permission, and were granted permits, which referred to the persons who constructed and maintained the line as the owners thereof.

From time to time when repairs and maintenance were required to keep the line in good condition, especially the poles supporting the transmission wires, the property owners and consumers either made the repairs themselves, or requested and secured the power company to make same for them, at their cost and expense.

In the latter part of the year 1932, a conference was had between some of the property owners and the Virginia Public Service Company, with reference to the necessity of making certain repairs, which both recognized as being necessary. Thereafter, some of the property owners engaged an experienced electrician, at their expense, to proceed, under their supervision, to overhaul and repair the line. New poles were furnished by the property owners, which were cut by their employees from their woods, and installed by such employees. While this work was in progress, the plaintiff, Barnett, was told that as a property owner and consumer of the electric current, he was expected to contribute his proportionate share of the cost of the repairs. The plaintiff preferring to contribute his services in lieu of a proportionate payment in cash, personally assisted in at least a part of the repair work. This work was in progress immediately before, and at the time of the fire. On the very morning of the day of the fire, post holes were being dug preparatory to rebuilding the line and replacing the rotten pole hereinafter mentioned. The workmen on this job had left the scene of their work, within a short distance of the locust tree, hereinafter mentioned, at approximately three o'clock of the afternoon of the day of the fire.

██ The plaintiff bases his assumption of the ownership and control by the defendant of the extension line on the ground that when he first applied for a service connection to his dwelling house, he was not informed by the defendant that it did not own, maintain, or control the line. Notwithstanding his claim that before the fire, he knew nothing of the original agreement with the first power company, and its continuance with its successor, his own evidence and actions indicate his knowledge to the contrary. He admits that he was informed of the defendant's position on or about Christmas, 1932, when a transformer was put up for service to his home. In addition to the evidence that he was informed by several of his neighbors relative to the working agreement between the parties, the circumstances with which he must necessarily have been familiar charge him with such knowledge. His testimony with reference to such knowledge is contradicted in many material particulars by a number of reputable witnesses, who were joint owners of the transmission line. The plaintiff's testimony in this regard is most confusing, misleading and contradictory. We may well assume that the jury gave consideration to the nature and character of such evidence.

It is well to consider here the difference between the responsibility of a company transmitting electric current over a line owned, maintained and controlled by it, and the responsibility of a company which merely transmits such current over a line it does not own or control. *Appalachian Power Co.* v. *Mitchell's Adm'x,* 145 Va. 409, 134 S. E. 558, 561; *Gallagher* v. *Waynesboro Mutual Telephone Co.,* 143 Va. 383, 130 S. E. 232; *Peters* v. *Lynchburg Light & Traction Co.,* 108 Va. 333, 61 S. E. 745, 22 L. R. A. (N. S.) 1188.

██ In the *Appalachian Case, supra,* a petition for a rehearing based one of the reasons therefor on two clauses in the original opinion. In a *per curiam* opinion, refusing a rehearing, Prentis, J., said:

"In this connection it is asserted that these portions of the opinion are in conflict with the previously settled law in this State and in most other jurisdictions, namely, that

a power company is not responsible for any alleged negligence arising out of the construction of a power line to which it merely furnishes power, but which it does not own or control.

"The criticized expression was not intended to create such a conflict. So to construe it is to misconstrue it. The context shows that the opinion neither overrules nor conflicts with the recent case of *Gallagher* v. *Waynesboro Mutual Telephone Co.,* 143 Va. 383, 130 S. E. 233. The power company, in this case, has been held responsible because of its relation to the power line involved. It aided in its construction, furnished the wire, alone used it, and assumed the responsibility for its maintenance. These and the circumstances indicated in the opinion differentiate this case from the *Gallagher Case, supra,* and the line of cases so insistently relied upon."

Here the plaintiff states he notified the power company of a dangerous condition, which the company failed to remedy. In the *Peters* and *Gallagher Cases, supra,* it does not appear that either power company was given such notice. However, the defendant here was not requested or directed by the plaintiff to suspend the electric service. The cause of the action is not attributed to an excessive electric current, nor is there involved the question of the liability of the power company to some innocent third person not connected with the use of the electric service. If one is an owner of an electric line, charged with the responsibility of maintaining it, he can no more relieve himself of that responsibility, and place it upon a power company merely transmitting the electricity, than he can require it to repair an electric appliance or fixture in his house, owned and controlled by him. If a power company does not own or control the line, and is not charged with the duty of maintaining it, it cannot be held liable for an injury to one whose duty it is to maintain it, caused by the failure of the latter to perform his duty.

We will next consider the evidence relating to the cause of the fire.

W. T. Barnett, in July or August, 1932, purchased a small tract of land with certain outbuildings located thereon, on the Stony Point road in Albemarle county. The main dwelling house had been theretofore destroyed by fire in June, 1932, and the dwelling house which is the subject of this litigation, had been erected upon the foundation of the house previously destroyed. The new house was two stories high, with basement and attic, of rock construction, with a rubber composition roof. It faced the south, with a gable extending east and west, and had a chimney in each of the western and eastern walls. There were four small half-circle windows in the attic, one on each side of the chimneys. In addition to these small openings, the plaintiff and several of his witnesses testified that there were two dormer windows in the back or northern side of the roof of the house, although this evidence was contradicted by other witnesses, including the carpenter who was said to have assisted the plaintiff in putting on the roof and building the dormer windows. It is claimed that these dormer windows consisted of two sashes of three panes of glass each, and were sixteen inches high by thirty-four inches wide. These windows were placed from twelve to fifteen feet from each end of the roof of the house. The plaintiff testified that they were left open on the day of the fire for the purpose of ventilation.

Extending along a fence row to the north of the house on the down slope of the hill, was the aforementioned transmission line, carrying twenty-three hundred volts of electricity. Beside the fence row was an electric pole from twenty to twenty-five feet high, which had apparently rotted at its base, and had a tendency to sway or lean over. On the top of this pole was a transformer, which reduced the current going into the house to between one hundred and ten and one hundred and thirty volts, for domestic light and power service. Near this pole and near the transmission line, which was supported by the pole, was a locust tree in the yard of Barnett, through which the wire ran into the house. The line of the poles and the direction of the line

of transmission towards the house was the same as that which existed before the purchase of the property by Barnett.

In the course of the construction of the house in the fall of 1932, Barnett reported to the defendant that he had discovered the rotted condition of the pole, and that by reason thereof the wire running to his house had come in contact with the locust tree, causing some sparks to fall therefrom. He reported that there were some scars on the locust tree evidencing the point of contact. It appears that sometime thereafter the defendant caused its employees to place some pike poles against the defective pole to support it and to prevent swaying. Subsequently, the plaintiff had one of his employees add a two by eight pole, twelve feet long, to further assist in supporting the defective pole.

On Sunday night, February 26, 1933, the plaintiff, his wife and son observed sparks arising from the contact of the transmission line and the tree, which were being blown by the wind towards the house. These sparks caused a fire in the grass or in the rubbish around the tree, which was put out by the occupants of the house.

On the following Monday night, a negro witness testified that, as he was going towards home along the road after dark, he saw a flash and some sparks dropping directly down on the ground under a tree in the Barnett yard. This presumedly was the locust tree, although it was not so definitely stated. This witness described the sparks as drifting down and "just falling dead on the ground."

On the following Tuesday morning, the plaintiff brought his wife and five children to Charlottesville, three miles distant from his home, and then returned to his home alone. While in Charlottesville, he states that he again reported to the district manager of the defendant company the rotten condition of the pole and the fire of the evening before. Barnett testifies that he was informed that the company could do nothing about it. The plaintiff did not request the defendant to cut off the current from his house.

Upon his return home on this day, Barnett remained there some hours with a witness named Brookman. Brookman left about twelve-thirty p. m., and the plaintiff, after remaining alone in his house sometime after Brookman left, returned to Charlottesville. Brookman says that after he left, he got a load of hogs, and about three p. m. he moved into a tenant house a short distance from Barnett's dwelling. Upon being informed by a neighbor that Barnett's house was on fire, he immediately went with a number of the neighbors to the house. When they arrived, the fire was upstairs in the attic in the gable end of the western part of the house, with a black smoke drifting out of the little half-circle windows at that end. He said that there was very little wind blowing, just enough to see which way it went. He further stated that he passed "pretty close" to the locust tree, and did not see any fire in that tree. He thought it was between three and four o'clock p. m. when he arrived.

The plaintiff, with his family, returned home about five-thirty p. m., and then found that his house was on fire and practically destroyed. No one was in the house at the time the fire started, and there is no direct or positive evidence from anyone as to the cause of the fire. The wire which brought the electricity to the house came from the defective pole through the locust tree directly to the northeast cornice of the house, under the roof. It was then fastened to an outlet, and brought down to the meter on the back porch, and through the meter into the house. The locust tree, which was in contact with the transmission line, was forty-one feet distant, in a northeasterly direction from the house to the nearest point. The point where the fire apparently originated, and was discovered, was in the western end of the attic, that portion of the house most distant from the locust tree. None of the witnesses who came to the fire, nor the workmen, who were digging the hole on that day, and had left off from their work about three p. m., observed any sign of fire that day in the locust tree. Nor did any of the witnesses observe any smoke coming from a dormer window.

The house was heated by a furnace and hot water system. The furnace was situated in the basement of the west side of the house, attached to a flue which extended along the western wall, and through the roof at the top point of the gable on the west side. This chimney also carried another flue, extending from a fireplace in the living-room° from the western side of the house. The base of the chimney was to the north of the center of the western wall. It was constructed in a perpendicular direction to the floor of the living-room, and brought over in an angle to the point of the flooring in the attic. At the point of the flooring of the attic there was another angle, and the chimney from that angle to its top was perpendicular. The day before the fire, the furnace had been used. On the morning of February 28th, there was a fire in the fireplace of the living-room; but the evidence of the plaintiff was that the fire in the furnace was out, and that he had put out the fire in the fireplace, and covered it with ashes before leaving the house. The western wall of the house was still standing at the time of the trial, and the premises, including the standing wall, and the construction of the chimney, were viewed by the jury.

The plaintiff's theory was that on account of the swaying of the defective pole, a short circuit occurred when the transmission line came into contact with the locust tree, causing a fire at that point, and that some burning part of the tree became detached, and was carried or blown into one of the dormer windows in the roof, and thence to the western end of the attic, setting fire to that end of the attic.

■■ In order to recover, the plaintiff must do more than merely prove he has suffered a loss. He must prove a wrong, the cause thereof, and trace it to the defendant. The burden of this proof rests upon the plaintiff. It is incumbent upon him to show how and why the fire occurred,— some fact or facts by which the cause can be determined by the jury, and not left entirely to conjecture, guess or random judgment. He is required to prove by a preponderance of the evidence that the fire was caused by some agency for

which the defendant was responsible. It is not sufficient that the evidence show a possibility, or even a mere probability, that the fire was caused in the manner charged. It must be based upon facts proved, or regarded as proved. *Southern Railway Co.* v. *American Peanut Corp., etc.,* 158 Va. 359, 164 S. E. 261; *C. & O. Ry. Co.* v. *Ware,* 122 Va. 246, 95 S. E. 183.

While there is no direct or positive evidence as to the cause of the fire, proof may be furnished by circumstantial evidence. The question here is, therefore, can we fairly and reasonably infer as a conclusion, aided by experience and reason, from the facts herein proved, or regarded as proved, that the fire which caused the destruction of the plaintiff's dwelling originated from a contact of the transmission line with the locust tree?

There is no evidence that sparks were emanating from the locust tree on February 28, 1933, the day of the fire. The day was clear, calm and practically windless, such little wind as did exist going towards the west. In the absence of any wind the sparks, formerly seen, dropped to the ground. The locust tree was downhill from the house, in a northeasterly direction a distance of forty-one feet at the nearest point. The dormer windows said to be in the roof of the house, were at least twelve feet from the northeast corner of the house. The fire unquestionably was in the western end of the attic, that portion of the house most remote from the locust tree. In order, therefore, to support the plaintiff's theory, the evidence must show that a burning spark or brand became ignited by contact of the transmission line with the tree on the day in question; that this brand or spark became detached from the tree, and was carried on this almost windless day uphill a distance of more than forty-one feet to the house, and through an open dormer window therein. The spark or brand during its travels would have had to remain sufficiently alive and burning to transmit a flame to that portion of the attic where it came to rest.

■ The theory of the plaintiff is based upon a chain of presumptions or inferences. To begin with, the first inference or presumption that the transmission wire, through contact with the tree, caused sparks to arise therefrom on the day in question, has not the required basis of a proved fact. There is merely a presumption that the contact of the wire with the tree caused some sparks to fall therefrom on February 28th, but no proof of the fact. The further inference or presumption that the spark was carried to the dormer window of the attic of the house, under the circumstances existing on the day in·question, does violence to our reasoning. There is not a single known fact, or a fact which may be regarded as proved, to show how the fire originated. The origin and source of the fire is conjectural and speculative. It is an unexplained fire. The fact that the plaintiff furnishes evidence that he left no cause for the fire within the house does not relieve him of the burden of showing how the fire occurred. It was not the duty of the defendant to account for, or to explain the origin of the fire.

■ The plaintiff contends that the trial court erred in refusing to permit the re-examination of the wife of the plaintiff as a witness in rebuttal. Mrs. Barnett was in ill health, and by agreement of counsel her deposition was taken and read to the jury. The principal matter about which it was desired to re-examine her concerned the existence of the dormer windows. There were numerous other witnesses, including the children of the plaintiff, and the workmen on the house, who might have been examined on this same question. This subject was in controversy early in the trial. Had Mrs. Barnett testified as to the existence of the dormer windows, such evidence would not have furnished any further light on the cause of the fire. No motion for a continuance on account of the illness of this witness was requested. Under the existing circumstances, the trial court cannot be said to have abused its discretion in refusing to permit her re-examination.

The remaining assignments of error relate to the granting and refusal of instructions. Since our view of the probative value of the evidence relating to the cause and origin of the fire concludes the case adversely to the plaintiff, it is unnecessary to discuss those assignments. However, what we have said with reference to the materiality of the fact of ownership, control and maintenance of power lines removes the force of the grounds of these assignments, except as to instruction number 3, granted for the defendant. While that instruction might very properly have set forth more clearly the specific nature and character of the duty of the plaintiff to protect his property, it should be read in connection with the other instructions given. The instruction is, in terms, too general, but, under the circumstances of this case, this constitutes at most but a harmless error. The instructions given were, as a whole, highly favorable to the plaintiff.

We agree with the opinion of the able and learned judge of the trial court that the verdict of the jury was the only proper verdict that could have been rendered.

The judgment is affirmed.

*Affirmed.*