FREEPORT SULPHUR COMPANY *vs.* PORTLAND GAS LIGHT COMPANY.

MAINE CENTRAL RAILROAD COMPANY

*vs.*

PORTLAND GAS LIGHT COMPANY.

PORTLAND TERMINAL COMPANY *vs.* PORTLAND GAS LIGHT COMPANY.

TEXAS GULF SULPHUR COMPANY *vs.* PORTLAND GAS LIGHT COMPANY.

Cumberland.    Opinion, April 15, 1938.

*Cook, Hutchinson, Pierce & Connell,*
*Single & Tyler,* for plaintiffs.
*Bradley, Linnell, Nulty & Brown,*
*Carl C. Jones,*
*Carroll N. Perkins,* for defendants.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

THAXTER, J.   These actions of tort which were tried together are before us on exceptions to the direction of a verdict for the defendant in each case.

The defendant is charged with responsibility for a fire which destroyed a wharf and equipment thereon of the Portland Terminal Company all valued at $271,877.53, freight cars with the contents thereof of the Maine Central Railroad Company valued at $17,019.98, sulphur belonging to the Freeport Sulphur Company valued at $23,500.00, and sulphur belonging to the Texas Gulf Sulphur Company valued at $22,427.79. The freight cars were standing on the wharf or near thereto at the time of the fire and the sulphur had been unloaded and was awaiting reshipment.

The defendant manufactures gas and distributes it in Portland and vicinity and is charged with having permitted to escape into the harbor from its premises, which are situated on the water-front about 1000 feet westerly from the wharf of the Terminal Company, large quantities of oil, gas waste and other materials of an inflammable nature, which became ignited on the water or flats under the wharf and destroyed the property in question.

The declaration in each case in one count alleges that the defendant negligently and in violation of a municipal ordinance permitted such oil and waste to be discharged into the harbor and that it became ignited and burned the wharf and other property; in another count the allegations are to the same effect except that it is charged that the defendant knew or in the exercise of reasonable

care should have known that a fire might take place. In each count there is an allegation that such condition constituted a public and private nuisance. There is also the usual allegation of the plaintiffs' due care.

The Portland Terminal Company operates a railroad terminal in Portland. Wharf No. 1, which was burned, was built of piles and extended along the Portland side of the harbor for a distance of 900 feet, the westerly end being a short distance easterly of the bridge connecting Portland and South Portland. Westerly just above the bridge was Wharf No. 2, and just above that was the property of the defendant, the Portland Gas Light Company. The distance was approximately 1000 feet from the westerly tower on Wharf No. 1 to the easterly line of the property of the defendant. At low tide about a half the area under the wharf was bare. At the northerly end of the wharf was a sea-wall and at high tide all of the flats as far back as the wall were covered with water. On the wharf were sulphur sheds, tracks, and four unloading towers or cranes which moved easterly and westerly along the front on the tracks. The engines for these cranes were operated by steam from boilers in the towers, and each tower had a chute from which ashes and cinders could be dropped from the fire-boxes through holes in the wharf to the water or flats below. Easterly is what is known as Deake's Wharf, on the westerly side of which and in the dock between it and the Terminal Company wharf was tied up on September 16, 1929, the day of the fire, a schooner named the *Elizabeth Bandi*. Alongside the Terminal Company wharf was the steamer *Plymouth* which had been discharging coal.

The defendant manufactured two kinds of gas, coal gas and water gas. The amount of water gas manufactured was small and it was only produced to supply peak demands. From the manufacture of the coal gas certain by-products were obtained, coke, a small amount of ammonia, and coal tar. In the manufacture of the water gas there was a small amount of water gas tar. As a matter of fact less than a tank car of this was produced in the period from August, 1928, to the time of the fire. The only substances which could have escaped from the plant of the Gas Company to cause the fire were these tar products or the oil which was on hand for the manufacture of the water gas. The water gas tar was stored in

what was known as No. 3 Holder Tank which had a capacity of approximately 400,000 gallons; and the evidence indicates that there was a very small amount of tar in this during the year preceding the fire, probably less than 10,000 gallons at any one time. There was no pipe from this holder to the water. Deliveries of this tar were made into tank cars by placing a temporary pipe over the top of the holder and pumping the tar into them. This holder was located some 450 feet from the water-front. The coal gas tar was produced in the retort house where the gas itself was manufactured. The gas went into storage holders, the coal gas tar ran from the retort house through a pipe suspended about thirty feet above the ground to a receiving well located beneath the ground about 400 feet from the water-front. This well had a capacity of approximately 125,000 gallons. The tar was pumped from this well into the tar storage well which had a capacity of 387,000 gallons. This was located in the same area as the receiving well. There was a pipe running to the wharf from this well from which the tar was pumped into tank steamers. The last shipment prior to the fire was on September 4th; and there is no evidence that tar had been pumped through this pipe prior to the fire since that date. The only other product on the defendant's premises which could in any way have caused the fire, if it had escaped into the harbor, was the oil used to manufacture the water gas. This oil was stored in four tanks. No pipe led from these to the water-front and there is no evidence that any of this oil escaped. There were a number of catch basins on the defendant's property which led into sewers which emptied into the harbor.

The fire started shortly after four o'clock in the afternoon of September 16, 1929. It apparently originated underneath the wharf, shot up between the steamer *Plymouth* and the piling, and in a very short space of time the entire structure with the buildings on it, the hoisting towers, and the bridge and upperworks of the steamer, were a mass of flame. Great clouds of black, billowing smoke rolled shoreward fanned by a gentle southwesterly breeze.

The plaintiffs had the burden of proving in the first place their own due care, secondly that oil, sludge, or tar on the water was a contributing cause of the fire, and thirdly that this oil, sludge, or tar escaped from the premises of the defendant through negligence.

We can not hold that as a matter of law there was any want of due care on the part of any of the plaintiffs. Likewise a jury would have been warranted in finding that the fire was caused by the ignition of oil floating on the water or covering the flats underneath the wharf. It is difficult to account for the rapid spread of the fire on any other theory. It is apparently conceded that on the day of the fire a large area of the harbor was covered with a heavy, oily substance. It stuck to the piles of the wharves as the tide receded; it was so heavy in spots as to support particles of coal which were dropped on it. It was in the dock between Deake's Wharf and the wharf of the Terminal Company. At the height of the fire a burning ember dropped in this dock and almost immediately flames spread over the surface of the water, seriously endangering the schooner which lay there. At least one of the pictures taken at the height of the fire shows flames running on the surface of the water in front of the wharf which was destroyed. A jury would have been perfectly justified in finding that the fire was caused by oil or by some inflammable substance on the water which became ignited, possibly by the dropping of hot coals from the hoisting towers.

But it is only by conjecture that we can connect the defendant with the escape of this oil. It may have come from the defendant's premises; it may have come from a number of other sources.

The contention of the plaintiffs is that large areas of this oil were found during the ebb of the tide in front of the defendant's property and that none of it extended above that point in a westerly direction. The inference is that, as the tide was flowing easterly, the only possible source of the oil was the defendant's premises. There is the testimony of one Thorndike that he saw a substance on the water in front of the defendant's property similar in all respects to water gas tar such as was produced at the plant of the Peaks Island Gas Company where he had worked some twenty years previously. Charles H. Powell, who was with him, says that it looked like road tar. There is also evidence from the draw tender on the railroad bridge, which at the time of the fire led from a point near the Gas Company's property on the Portland side of the harbor to the South Portland shore. This man testified that he had seen at various times an oily or tarry substance running down the retaining wall of the defendant's property into the harbor.

If the substance on the water could be identified as coal tar or water gas tar there might be something to the plaintiffs' claim. But from the plaintiffs' own witnesses the conclusion is irresistible that the witness Thorndike was mistaken in identifying this as tar. Samuel Kamerling, a chemist called by the plaintiffs, testified that he dropped samples of the tar residues obtained from the defendant's premises into water and that the substance sank leaving a thin film of oil on the surface. Walker W. Stevenson, another expert for the plaintiffs, testified that the tar product of the defendant would sink in water but that the light oils, which were a part of it, had a specific gravity lighter than water and would float. The testimony of the defendant's experts is exactly to the same effect. It seems to be conclusively established that tar products will sink; that petroleum products will float. When the tar drops into the water, the oils are apparently separated and remain on the surface; the rest sinks. This scientific fact seems to render utterly worthless the identification by Thorndike of this substance on the water as a tar residue. Possibly it may have collected dust from coal which was being unloaded; it may have had the appearance of tar; it may have smelled like tar; but it certainly was not tar.

What of the fact that Thorndike saw it in front of the defendant's premises? Thorndike went in his boat to a point just westerly of the South Portland bridge. This was about one o'clock. The tide had been ebbing for three hours and it continued to go out for about three hours more. Fore River, which forms the extreme upper end of Portland Harbor, extends for a mile or more above the bridge. At various points westerly beyond the defendant's property and along the shore were oil distributing plants. The tide had been flowing easterly for three hours at the rate of approximately a mile an hour. It is perfectly possible that the substance which Thorndike saw in front of the defendant's plant may have been the last portion of what had come down from far up in the inner harbor. That it was found near the defendant's property is of no importance in determining its source. It had been subject, for we do not know how long a time, to the restless currents surging in from the ocean and to the whims of the receding waters as the tide ebbed.

The plaintiffs have shown with great detail the various catch basins and pipes from which tar could have escaped from the prop-

erty of the defendant. But that this could have escaped is not proof that it did do so. In fact there is not a shred of direct evidence that any oil, or tar, or any other product ran out from its container and flowed over the ground and into the sewers. On the contrary, the testimony of every employee of the Gas Company who took the stand is to the effect that no such accident happened on the day of the fire or at any time immediately prior thereto.

The only other evidence bearing on this point is that of Walter Smith, the draw tender on the railroad bridge. He testified that on a number of occasions he had seen little rivulets running down the stone wall of the defendant's property and on these rivulets there was a blue scum which, spreading over the surface of the water, gave out many kinds of colors. The witness says: "It would show different colors as they glinted, like a diamond." This is a perfect description of the action of a small amount of oil which, spreading out over the water, gives forth iridescent hues as the sun's rays strike it from various angles. This scum, he said, would float down with the tide and then would float back again. Subsequently the witness said it looked and smelled like tar. But the description which he first gave was certainly not a description of tar. He stated on cross-examination that practically every day he saw oil on the surface of the harbor, but noticed nothing in particular on the day of the fire. The real weight to be given to his testimony is perhaps best summed up by himself: "Now that is a long time ago, and I am getting old, and I don't remember as well as though I was a young man." In so far as he says he saw tar on the surface of the water he is clearly mistaken. What he described could not have been tar any more than what Thorndike saw. It was oil. It is not at all improbable that he saw oily water dripping or running from the crevices in the retaining wall of the Gas Company. The harbor was often covered with oil as his own testimony shows. This was carried in with the tide under the wharves, through cracks and crevices, and into pools and hollows, and as the tide fell it ran out again. There is not the slightest suggestion from this witness that there was at any time any such outpouring of oil or tar from the premises of the defendant as the plaintiffs would have us believe.

The plaintiffs call attention to a supposed shortage in the amount of coal tar produced per ton of coal during the month of

September 1929 and a supposed shortage in the amount on hand. This might be corrobative of evidence, circumstantial or direct, that tar escaped into the harbor. In the absence of such evidence, it is not by itself proof that the tar did so escape. In any event, the defendant seems to have offered an explanation for the supposed shortage.

Taking the plaintiffs' own testimony in the light most favorable to them, it would be pure guesswork to assume that the great mass of oil which was floating on the surface of Portland Harbor on the day of the fire came from the plant of the defendant.

Opposed to the claim of the plaintiffs there is much testimony from witnesses for the defendant to indicate that this substance, whatever it may have been, did not come from the defendant's plant.

At six o'clock in the morning of the day of the fire great masses of thick oil were seen in front of the Portland Yacht Club, which is approximately half a mile easterly of the defendant's premises. At seven o'clock the third officer of the *Plymouth* saw it near his steamer. At this time the tide had been running in for approximately three hours. The substance which was at the Yacht Club and around the steamer *Plymouth* at that time must, therefore, have come from the lower harbor and have drifted from east to west with the current. It clearly did not come from the Gas Company unless it had been carried down by the ebb tide during the early part of the night and had come back on the flood.

The only way by which through accident the tar could have flowed into the harbor would have been by an overflow from the tanks where it was stored and by its running from them into the catch basins, or by a defect in the tanks which would permit it to escape into the ground. In either case the trouble would have been known to the men in the plant; and numbers of them testified that no such accident took place. It would likewise have been possible to have had a leakage through the pipe connections in the process of loading the tank steamers, but the last boat which was loaded prior to the fire sailed on September fourth.

There is no evidence whatsoever that any oil or tar was seen escaping from the defendant's premises, unless the testimony of Walter Smith can be so construed. The plaintiffs' case is built on circumstantial evidence, the main link of which is that coal tar was

found on the surface of the water which could have been produced only by the defendant. The evidence is, however, conclusive that the substance on the water was not tar. When that link in the chain snaps, the whole case falls. There unquestionably was oil of some kind on the surface of the harbor on the day of the fire and that may have come from a number of different places. When we are forced into the realm of pure conjecture, there is nothing for a jury to consider. *Allen* v. *Maine Central Railroad Company*, 112 Me., 480, 92 A., 615.

Since the weight of the evidence does not sustain the proposition that the fire arose in consequence of the escape of oil or other substance from the premises of the defendant, the aspect of the allegation of nuisance, assuming, but not deciding, such phase of the rule, need not have consideration.

The direction of a verdict for the defendant was correct.

*Exceptions overruled.*