EDWARD F. TIBBETTS *vs.* CENTRAL MAINE POWER CO.

Lincoln.    Opinion, September 28, 1946.

*Ralph A. Gallagher,*

*Reginald H. Harris,* for the plaintiff.

*Perkins, Weeks & Hutchins,*

*William H. Dunham,*

*Charles M. Giles,* for the defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MURCHIE, TOMPKINS, FELLOWS, JJ.

TOMPKINS, J.    Action on the case to recover damages for the destruction of the plaintiff's dwelling house by fire. The plaintiff in his writ set forth three counts for negligence, (1) alleging failure of the defendant to repair or replace defective wires after notice, (2) failure of the defendant to disconnect or shut off the power in the defective wires after notice, and (3) negligence of the defendant in attaching wires to the limb of an apple tree in a place exposed to storm. The defendant pleaded the general issue. Trial by jury.

The third count in the plaintiff's writ was eliminated from the consideration of the jury.

The plaintiff was under guardianship at the time of the bringing of the action and at the time of the trial. Maud Bernice Tibbetts, wife of the plaintiff, was the duly qualified guardian. The defendant is a public utility corporation engaged in the business of furnishing electricity for light and power.

After the close of all the testimony the defendant moved for a

directed verdict, which motion the presiding justice denied, to which denial the defendant seasonably excepted. After verdict for plaintiff, defendant filed a general motion for a new trial. The motion raises the same question for consideration as does the exception. *Symonds* v. *Free Street Corporation*, 135 Me., 501. *Fort Fairfield* v. *Millinocket*, 136 Me., 426. We shall consider only the motion for a new trial.

The defendant does not press the contention that the damages were unduly excessive as ground for a new trial. In considering a motion for a new trial the evidence must be viewed in the light most favorable to the successful party. The defendant has the burden of proving that the jury verdict is manifestly wrong, *Marr* v. *Hicks*, 136 Me., 33; *Dube* v. *Sherman*, 135 Me., 144; *Cameron* v. *Lewiston, Brunswick & Bath Street Railway*, 103 Me., 482. The plaintiff does not rely upon the doctrine of *res ipsa loquitur*. "To entitle the plaintiff to recover he must show, first, that the defendant was guilty of negligence; the injury itself does not import negligence." Consequently he must show that the defendant's negligence caused the injury. "There must be a visible connection of cause and effect. It is not enough to show that the defendant's negligence was adequate and sufficient to cause it— that it might have caused it—he must show that it did cause it; that it was the preponderating, efficient cause of the injury." *Lesan* v. *Maine Central Railroad Company*, 77 Me., 85.

The plaintiff was the owner in fee of the dwelling house alleged to have been destroyed by the defendant's negligence. The house was located at Christmas Cove in South Bristol, Lincoln County. The structure consisted of the main house, the ell, and the annex to the ell some 10 x 13 feet in length and breadth, and between eight and nine feet high, with a flat roof. The latter structure is referred to in the testimony as the washroom, the laundry, or the little ell. The entire set of buildings was constructed of wood and painted. With the exception of the laundry the structure had been built about seventy-five years. The fire that destroyed the buildings was first discovered by the witness Theodore H. Eaton be-

tween three and four o'clock in the morning of September 19, 1944. According to the testimony of Mrs. Tibbetts, the guardian, the building had been vacant from the very last of August 1944 up to the time of the fire. Up to the last of August it had been occupied by summer tenants. The house was heated by an open fireplace and one or two stoves.

The 110-volt, two-wire service that supplied the electricity to the destroyed building led from pole #19 maintained by the defendant in the highway. The wires led across the plaintiff's land and were attached to the large limb of an apple tree standing on this land. The tree stood in a sheltered place and was about twenty feet from the laundry. At the apple tree the wires were affixed to the limb by insulated fittings on an iron bracket bolted to the limb. From the apple tree the wires led to the finish board upon the north side of the laundry, to which they were attached by porcelain knobs. These knobs were higher than the weather head on the conduit. The wires looped down from the porcelain knobs and entered the weather head on an upright galvanized iron conduit or pipe. The lead-in wires were #6, and the ones entering the conduit leading to the switch and ground installation were #8. The current available had the switch been closed was 110 volts. The Hyson cottage which the witness Eaton occupied at the time of the fire, and the buildings destroyed by the fire, received electricity from the same pair of wires. An employee of the defendant had sealed the switch open sometime prior to the fire so that no current would flow into the house beyond the switch. The switch was in the service entrance box located on the inside wall of the laundry. The two service wires reached the box through a porcelain bushing in the upright galvanized iron conduit or pipe, which was on the outside of the north wall of the laundry near the junction of the laundry with the ell. The porcelain bushing was missing at the time of the trial. The pipe had a galvanized iron arm or tee running at right angles to it through the wall of the laundry to the switch box. The wires entered the switch box through this arm. The service installation was sixteen

years old and of standard type, and no radical changes would have been made if installed under present day methods.

On the Thursday preceding the fire which occurred on the following Tuesday morning there was a high wind, referred to as a hurricane. On the following Friday morning Maud Bernice Tibbetts discovered that the limb of the apple tree to which the wires were affixed had fallen. The butt of the limb was still clinging to the tree and was several feet above the ground. The other end was down and resting on the smaller branches of the broken limb. She testified that the wires were sagged, and up at the corner of the house where they were attached to the laundry were pulled away and the casing was all ragged, and the wires were swaying in the wind. She did not see the wires again before the fire. On the Saturday following this discovery her daughter, Geraldine Kelsey, accompanied by Lettie Kelsey, her mother-in-law, notified the defendant company that the house needed attention, that the limb was down. The mother-in-law at the same time said: "I saw the house Friday afternoon and I think they should be attended to at once in case of fire, or something like that." This notification was delivered verbally at about seven o'clock on Saturday evening. Lewis Kelsey, the plaintiff's witness, testified that on this Tuesday morning he saw the glow of the fire from a distance of two miles, that he was awakened by the siren of the fire engine. When Mr. Kelsey arrived the whole outside of the laundry was ablaze. He could not tell at what point the fire started nor whether the fire started on the inside of the building or on the outside.

Charles L. Gammage was called by the plaintiff and testified as an expert on house wiring and on electrical installation and maintenance. This witness on direct examination was asked an hypothetical question as to the cause of the fire. His answer was: "Well, as I say, assuming those cases to be true, the wire had chafed there on the top of the pipe, heating the pipe to a point where it ignited the building." On cross-examination with reference to this answer to the hypothetical question he said "I defi-

nitely said I did not know what caused the fire. I was asked what could cause the fire." He further said if there was an arcing at the end of the pipe it would be burned but not necessarily any pitting, and after going through the fire, and the lapse of thirteen months, the burning would not be discernible. This witness was asked the following question:

"Q  A very quiet night, wasn't it?

A  I don't recall. It never is quite down there. Always a breeze."

Winfield H. Bearce, an employee of the defendant company, qualified as an expert in the field of electricity. Some thirteen months after the fire he found the conduit in a vertical position located along side of the wall that had disappeared. He found the ground rod driven into the ground some two feet from the base of the conduit, found the wires in position in the conduit, leaving approximately two inches exposed from the end of the weather head. The wires had been previously cut off by an employee of the defendant company. He found the ground wire attached to the ground rod, and the conduit driven into the ground a little more than a foot at the base. The tee and the switch attached were in position on the iron conduit. Mrs. Tibbetts testified in rebuttal that shortly after the fire she saw this conduit and attached switch box down in the ruins. Mr. Bearce testified that if there had been a contact between the bare #8 wires which entered the weather head, the copper wire would have been electrically burned by the arc, and the weather head would have had part of it melted away. In case of a permanent contact there would have been a weld mark. His examination of the weather head and the wires in the conduit showed no sign of any weld mark or electrical burning, and after the lapse of thirteen months the arc mark and the weld mark would be found. The wires still had some insulation on them. The wires had been annealed by the heat of the fire and all showed signs of having been very hot.

C. J. Sittinger qualified and testified as an expert for the defendant. Mr. Sittinger is a consulting engineer, and has been engaged in electrical work about thirty-five years since his graduation from Massachusetts Institute of Technology. He testified if there was an arcing between the #8 covered service wires in the galvanized iron pipe or conduit and the weather cap that the copper metal would be subtracted and deposited on the conduit, and that the pipe, weather head and wires indicated the absence of arcing. He also testified, based on the data given in the testimony, that under the worst conditions, producing the most heat, the conduit would heat up to about two hundred degrees Fahrenheit, and that the igniting temperature of a dry pine board, depending on the dryness of the board and the age, would ignite at about twelve hundred degrees. This same witness testified that the effect of a short circuit, caused by contact between a live wire and the conduit, at a house in the location of the plaintiff's, would appreciably reduce the light in a building located as was the Hyson cottage.

A defense witness, Theodore H. Eaton, testified that he was occupying the Hyson cottage about two hundred feet distant from the burning building. He was awakened about three o'clock in the morning of the fire and saw the blaze from his window. His daughter went to a neighbor's house and notified the fire department which arrived, as nearly as the witness could estimate, in not less than half an hour. When he turned on the lights in his own cottage he noticed nò disturbance or failure of light in the electric bulbs. After assisting his wife, who was lame, from her bed to the front porch of the cottage, he went over to the burning building. He stood within forty or fifty feet of the back of the building which was burning. When he arrived the laundry was burning and the fire was coming from the inside and breaking out a foot to two below the eaves on the southwest corner of the laundry. This corner was diagonally across from the conduit, housing the service wires entering the laundry. The night was still and the smoke went straight up.

These are the salient features of the case, contained in some two hundred pages of printed testimony. From the testimony the jury was asked to determine, not what might cause the fire, but what did cause it.

The contention of the plaintiff appears to be that the insulation of the service wires leading into the weather head was worn by swaying in the wind against the rough edge of the conduit, and that this damage to the insulation caused there an arcing or freezing of the wires to the pipe, which heated the pipe at some point to a temperature sufficient to ignite the side wall of the laundry to which the pipe and the weather head were attached. The plaintiff contends that the circumstantial evidence in the case is sufficient to satisfy the burden of proof, and that the jury verdict should stand.

It is the duty of the plaintiff to prove by a fair preponderance of the evidence that some instrumentality of the defendant caused the fire. This proof consisted primarily of the fact that on the Friday previous to the fire there had been a high wind. The limb of the apple tree supporting the lead-in wires had fallen. Mrs. Tibbetts and another witness testified they saw the wires leading into the weather head sagging and swaying, the extent of which was not elaborated on. On the following Tuesday the house burned. There was no further testimony in the plaintiff's evidence on the situation in regard to the weather conditions except one witness who, when asked if the night of the fire was quiet, replied "I don't recall. It is never quiet down there. Always a breeze."

From the testimony the inference is sought to be established that the insulation on the wires was removed by chafing against the rough edge of the entrance of the conduit, the insulation worn away and the bare wire or wires made contact with the pipe. The installation was of standard construction, and the wires would not ordinarily rest on the edge of the pipe because of the porcelain fitting in its entrance. Assume, however, that the insulation of the wires had been worn away and contact was made with the con-

duit so that there was an arcing or freezing as claimed by the plaintiff, and this pipe at some point was heated to such a degree that it ignited the outside of the laundry where it rested against the wall. To substantiate this contention there was no testimony produced by the plaintiff to show, or tending to show, the fire originated in the vicinity of the conduit, weather head or switch box. There was no attempt made to show the nature of the material of the building in the vicinity of the conduit and the tee, except that it was constructed of wood. There was no attempt to show the kind of weather intervening between the time of the discovery of the damage to the wires and the occurrence of the fire. The defendant's witness, Mr. Sittinger, testified that, depending upon the weather and the kind of wood, the ignition point varied. Taking, however, a dry pine clapboard as an example, he said this would ignite at twelve hundred degrees Fahrenheit. He also testified that the greatest heat that would be generated in the wires in this pipe would be two hundred degrees Fahrenheit.

The testimony of the defendant's witness Eaton was of great significance. He was the first to arrive on the scene. According to his testimony the fire was burning from the inside out. The flames were breaking out under the eaves of the laundry at its southwest corner, at a point farthest from the conduit located on the outer wall of the laundry and the switch box on the inner wall. The switch was sealed open so that no current could flow into the laundry. The testimony of Mr. Sittinger was that with an open circuit, a 110-volt current could not flow through open points separated three or four inches, as the points were in the switch box. The same witness testified further that he examined the conduit and the tee, and the wires disclosed no arcing or freezing. This statement was also corroborated by the defense witness, Winfield H. Bearce.

The entire fabric of the plaintiff's right to recover rests on the assumption that the fire started with the chafing of the wires against the edge of the conduit where the wires entered the

weather head, that as a result of this chafing the bare wire or wires came in contact with this conduit and caused an arcing or freezing of the wires to the pipe, that the pipe at some point was heated to a temperature that ignited the building at the point of contact between the building and the conduit. The plaintiff's witness does not establish it by direct or indirect proof. No such inference can be drawn because the physical facts which were established by the witness Eaton rebut the inference that the fire started at the place where the conduit was fastened to the laundry. A further piece of evidence by the same witness, that he did not observe any diminution in the lights in the Hyson cottage when he turned them on the morning of the fire, also rebuts the assumption or inference that an arc had been formed in the conduit. He was in a position to see and observe this if it had occurred.

"In order to recover the plaintiff must show, more than merely prove, that he has suffered a loss, he must prove a wrong the cause thereof, and trace it to the defendant. The burden of this proof rests upon the plaintiff. It is incumbent upon him to show how and why the fire occurred—some fact or facts by which the cause can be determined by the jury, and not left to conjecture, guess, or random judgment. He is required to prove by a preponderance of the evidence that the fire was caused by some agency for which the defendant was responsible. It is not sufficient that the evidence shows a possibility, or even a mere probability that the fire was caused in the manner charged. It must be based upon facts proved or regarded as proved."

*Barnett* v. *Virginia Public Service Co.*, 193 S. E., 538; *Lesan* v. *Maine Central Railroad Company*, supra.

Considering all the testimony in the light most favorable to the plaintiff, and giving to the testimony of the experts the weight to which it is entitled, we are led to the conclusion that the evi-

dence does not support the plaintiff's contention that the fire was caused by the defendant's service wires. In view of our conclusion on this vital point the question of whether or not the defendant was negligent becomes unimportant.

*Verdict set aside.*
*New trial granted.*