CHARLES UNOBSKEY ET AL.

*vs.*

CONTINENTAL INSURANCE COMPANY

Washington. Opinion, January 31, 1952

*Blaisdell & Blaisdell,* for plaintiff.

*Berman, Berman & Wernick,* for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

FELLOWS, J. This case brought by Charles Unobskey and Arthur H. Unobskey both of Calais, doing business as Unobskey Brothers, against the Continental Insurance Company, comes to the Law Court from the Superior Court of Washington County for final decision on a report of the evidence. By agreement, the decision in this case is to govern twenty companion cases named by the presiding justice of the Superior Court in his order for this report to the Law Court, and now on the Washington County Superior Court docket. These companion cases were brought by these plaintiffs against twenty other insurance companies, on the same or similar policies of insurance with the same endorsements, and governed by the same facts. All twenty-one writs are dated August 14, 1950.

The principal circumstances are these: The plaintiffs Arthur H. Unobskey and Charles Unobskey purchased, through a Calais insurance agency, fire insurance under the Maine Standard Policy, which policy was in force at the time of their losses hereinafter mentioned. Attached to the policy, and made a part of it, was an extended coverage endorsement which covered other perils including "windstorm."

On March 9, 1950 there occurred a very severe storm with high wind and heavy rain, and during the storm an outside door leading into plaintiff's retail store was torn open and the store basement flooded with water in a few minutes. The flooding of the basement resulted in damage of more than twenty thousand dollars. It is disputed as to whether the door was forced open by force of the wind or by force of accumulated water.

The portions of the endorsements on the policy which are in question are as follows: "The coverage of this policy is extended to include direct loss by *Windstorm, Hail, Explosion, Riot, Riot Attending a Strike, Civil Commotion, Aircraft, Vehicles, and Smoke.*"

> *"Provisions Applicable Only to Windstorm and Hail:* This Company shall not be liable for loss caused directly or indirectly by (a) frost or cold weather or (b) snowstorm, tidal wave, high water or overflow, whether driven by wind or not.

> This Company shall not be liable for loss to the interior of the building or the insured property therein caused, (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building insured or containing the property insured shall first sustain an actual damage to roof or walls by the direct force of wind or hail and then shall be liable for loss to the interior of the building or the insured property therein as may be caused by rain, snow, sand or dust entering the building through openings in the roof or walls made by direct action of wind or hail or (b) by water from sprinkler equipment or other piping, unless such equipment or piping be damaged as a direct result of wind or hail."

The store of the plaintiffs was on the main street of Calais. In the rear of the store was a large vacant lot used by abutting owners for parking cars as well as for other purposes. This parking lot was lower than the land and streets about it. The land area here was, therefore, a sort

of bowl sloping upward from this parking lot to the adjoining land and adjacent streets. That this lot was lower than the surrounding territory, and that it was recognized that a large quantity of water was likely to accumulate during rainy weather, is demonstrated by the fact that there were many manholes and catch basins in the lot and in its near vicinity to carry off the accumulations.

In the early morning hours of March 9, 1950, a heavy wind and rainstorm occurred. There was a high wind for several hours with a heavy downpour of rain. Somewhere between 4:15 A.M. and 4:30 A.M. the outside door in the rear of plaintiffs' store was torn open, and a "river" of water went through the doorway down a flight of basement stairs, broke in an inside door leading into the basement, and in a few minutes completely flooded the large basement of the plaintiffs and damaged their stock.

The plaintiffs contend that they are entitled to recover under the extended coverage endorsement of their policy, because they say that this damage was caused by "windstorm." They claim that the "rain" entered the property of the plaintiffs through an opening in the "wall" of plaintiffs' premises, which opening was caused by the direct force of wind. In other words, that the accumulated rain water entered the basement through an opening caused by the windstorm, and caused the damage complained of; that the storm was the cause and the defendant is liable for all damage that followed.

The defendant, on the other hand, contends that the damage to plaintiffs' merchandise was not caused by windstorm, but was caused by pressure of water which had accumulated against the rear wall and door of the plaintiffs' store, not only from the rain but from the thawing of large quantities of snow, and that the pressure of water against the rear door was the cause of the breaking in of the door and the consequent damage. The defendant also claims that the

policy did not cover damage from accumulated surface water, in any event.

A brief summary of the testimony of the witnesses in the order of presentation is as follows: The testimony of Arthur Unobskey shows that he was awakened at about 4 A.M. by a terrific wind and rain storm, and he immediately called his manager, Holland, to look the store over. At 4:15 A.M. Holland reported everything in proper order and condition. At 4:30 A.M. Holland reported that the basement door had broken in and the basement was being flooded. Mr. Unobskey went to the store and found that damage to the door was a broken latch or hasp that had torn out, and permitted the door to open and the outside water to pour into the basement, breaking the inside basement door.

Edgar C. Camick, in charge of U. S. Weather Bureau in Eastport eighteen miles away, who recorded the weather conditions that morning from 1 to 5 A.M. said that the wind reached the maximum velocity of 44 miles, and for one minute at 3:17 A.M. reached 49 miles; that at 44 miles per hour it would be considered "gale force." Frank C. Holden, mechanical engineer, who qualified as an expert on strains and stresses through wind and water pressure, stated that a wind velocity of seventy miles per hour or 300 pounds pressure would be necessary to cause failure of this latched door, and that a depth of water of 28½ inches would produce a force of 300 pounds.

Morris Holland, uncle of the plaintiffs and store manager, lived in apartment over the store, and at 4 A.M. received a call from one of the plaintiffs, went down around and looked store over. Everything in good order, until a few minutes after, or about 4:30 A.M. when he heard terrific crash and found water rushing into the basement through the broken outside door and broken inside door. The basement was very quickly filled. "The wind was

steady and pretty hard and I had to hang to building to get in." He described outside door and sill, the sill being seven inches higher than first step. The water was then up to the sill. Frank Frost, manager of a Calais bank, lives 500 yards from Unobskey store. He heard a crashing sound before daylight. It was one of the worst windstorms he had ever seen. The wind tore off shingles. Roy L. Waite, manager of St. Croix Electric Company said that the storm caused no serious damage to power lines but caused considerable trouble through disrupting circuits, and tree branches falling and breaking wires. The snow disappeared during the night and streets were very wet. It was an unusual storm.

Byrne O'Neil, Street Commissioner, had a duty to clear catch basins, and went around at 4 A.M. in Unobskey parking space. Rear door of store was then all right. Depth of water (on slightly higher ground) at 25 feet distant from Unobskey store then about 8 inches in parking place. One and one-half hours later he saw the Unobskey door open. Some limbs of trees blown down. His own storm door blown off. Water everywhere in large quantities—running down street and between houses and over the parking lot. Parking lot was only place for water to go as it came down the streets and the land above. Weather warm, rainy, wind blowing, snow melting. Between 9 and 11 catch basins were within 300 feet of each other and 300 feet from the store. Two catch basins on the lot itself. The catch basins and sewers could not take care of the large amounts of water. Arthur Kallenberg, manager of State Theatre adjoining Unobskey store, visited his theatre about 7:30 A.M. Not much water in theatre. Some water came through walls into theatre but sump pump cleared it. Lewis E. Kenison, civil engineer, testified that all the terrain sloped upward from Unobskey lot. He was awakened at 5 A.M. Extraordinary downpour of rain and exceptionally strong wind. There had been six to nine inches of snow on the ground which

had melted during the storm. Great quantities of water ran in streets.

Philip Hollingdale, the manager of adjoining A. & P. store, said that at 7 A.M. there was water in his store and 8 to 10 inches in the cellar. There was mud also. The water and mud came in under the back door from the parking lot. Ruth Goode and Ella M. Lowther who lived in nearby houses on higher ground than the parking lot, testified to high wind and much rain, and that torrents of water were running down the streets toward the parking lot.

Harry P. Tracy, the Chief of Fire Department, called out at about 5 A.M. with complaints of flooded cellars. A call came from Mr. Unobskey requesting a pumper. Water running in neighboring streets 18 inches deep in places. "Flood conditions" in the highways. Pumped out Unobskey basement into Main Street with "500 gallon pumper." On back wall of Unobskey store there was a "silt line" or water line plainly marked and "quite noticeable." The line was also on Unobskey back door which had been forced open. The line was up to the windows. The same line was on the theatre wall also. Tracy arrived at about 6 A.M. There was much water in parking space but "we got around all right in our boots." John F. Marquis, insurance adjuster, went with John A. Strossman, branch insurance manager, to Unobskey store on March 23rd. They had photographs made, and testified to the silt line they observed. The water mark, or silt mark, on the door which was broken in was 28½ inches above the top of cement sill. The sill was 4 inches above the ground.

It is the well recognized rule that in the interpretation of a policy of insurance it must be liberally construed in favor of the insured, so as not to defeat without a plain necessity his claim to indemnity. *Barnes* v. *Insurance Co.*, 122 Me. 486, 491; *McGlinchey* v. *Fidelity and Casualty Co.*, 80 Me. 251. This doctrine, however, is not applicable unless there

is ambiguity in the terms of the policy. The terms of the policy are to be taken and understood in ordinary sense. *Lunt et al.* v. *Fidelity and Casualty Co.*, 139 Me. 218, 223.

The terms of a policy cannot be enlarged or diminished by judicial construction. The function of the court is not to make a new contract, but to ascertain the meaning and intention of that actually made. *Johnson* v. *Insurance Co.*, 131 Me. 288. A contract of insurance like every other contract must receive a reasonable construction. *Wheeler* v. *Phoenix Indemnity Co.*, 144 Me. 105, 65 Atl. (2nd) 10.

The questions presented for determination appear to be (1) Was this storm of March 9, 1950 a "windstorm" within the meaning of the policy? (2) Was the breaking in of the door caused by wind? (3) Was this a "direct loss by windstorm?"

When the policy and the endorsements on the policy, in this case, are carefully examined, it very clearly appears that the plaintiffs were insured against "fire," and that the "policy is extended to include direct loss by windstorm." It is not extended to rainstorm, or to snowstorm. It is windstorm. It is also specifically stated that the defendant company "shall not be liable *** for tidal wave, high water or overflow whether driven by wind or not." The company insured against nothing except "rain, snow, sand or dust" and then only when "the property insured shall first sustain an actual damage to roof or walls by the direct force of wind *** and then shall be liable for loss to the interior of the building, or the insured property therein, as may be caused by rain, snow, sand or dust entering the building through openings in the roof or walls made by direct action of wind."

The evidence presented by this record satisfies the court that this storm of March 9, 1950 was a "windstorm" and within the meaning of the provisions of the policy. The wind was unusual, and at times of "gale force."

When we consider the breaking of the outside door, we are confronted, however, with a most troublesome question. Was the cause high wind or was it high water? The evidence before us on this is to the effect (1) a strong wind at about, or just before the time of the breaking away of the bolt or latch; (2) the noise of a crash; (3) so much water which must have been against the door that when the door opened the inside door was "smashed" by force of the rushing water, and the entire basement flooded in a very short time; (4) that the inside door was broken by force of water alone, no wind was inside the building; (5) "within half or three-quarters of an hour the cellar was full up to the beams;" (6) the testimony regarding the silt line, or silt deposit, on the walls, windows, and broken door, 28½ inches above the sill; (7) the testimony of Holden, plaintiffs' witness, which indicates that from his examination and experiments the wind might not have blown the door open unless it reached a velocity of 70 miles an hour, and that the water might have forced it; (8) the lack of evidence showing that the wind was blowing in gusts, or was blowing towards the door, at, or about the time, the bolt was torn out; (9) some testimony indicating that the wind was lessening in force at the time the door was broken open, and that the depth of water was increasing.

It is probable that all available evidence has been discovered and offered, but from the evidence which was presented, the court can only guess why the door opened when it did open, and can only speculate on whether the dominant cause was wind or water. It may have been due to either cause, and it may have been jointly or equally due to both causes. The proof is lacking from which even a satisfactory probability can be determined.

It is of course true, that if this windstorm had not occurred, and if there had been no heavy rain, and if the sewers had been sufficient, there could have been no damage done to the stock in the basement. The policy did not insure

against all eventualities. There must be proof in the first instance, under the terms of the contract, that the building suffered actual damage in roof or walls by direct force of wind, and not some other force not expected or provided for. This proof is not in the record. See *Gelber* v. *Paramount Fire Ins. Co.* (Mo.), 219 S. W. (2nd) 871.

Conjecture, choice of possibilities, or quantitative probability is not proof. "There must be something more to lead a reasoning mind to one conclusion rather than to the other." *McTaggart* v. *Railroad Co.*, 100 Me. 223, 230; *Mosher* v. *Smithfield*, 84 Me. 334; *Edwards* v. *Express Co.*, 128 Me. 470. There is nothing for consideration when a decision can only be based on conjecture. *Sulphur Railroad, Terminal Co.* v. *Gas Light Co.*, 135 Me. 408; *Tibbetts* v. *Central Maine Power Co.*, 142 Me. 190.

If we should assume (which the submitted proof does not warrant) that the door was broken by combined force of wind and water and that the wind was the dominant cause, then there could be a recovery for the damage to the door. The contract of insurance contemplated, in addition to this damage, only the damage caused by rain that directly entered the building through the broken door. It did not cover the damage caused by running surface water from rainstorm and melting snow, that overflowed the catch basins and the parking area. See *Parish* v. *County Fire Ins. Co.*, 126 A. L. R. 703 (Anno.), 134 Neb. 563, 279 N. W. 170.

*Judgment for Defendant.*