Herman **ABADY**, Irving S. Abady, Albert Liniado and Sam Liniado, Appellants,

v.

**HANOVER FIRE INSURANCE COMPANY**, St. Paul Fire & Marine Insurance Company, Home Insurance Company, United States Fidelity & Guaranty Company and Old Colony Insurance Company, Appellees.

### No. 7801.

United States Court of Appeals Fourth Circuit.

Argued March 11, 1959.

Decided April 13, 1959.

Emanuel Emroch, Richmond, Va. (Charles P. Rosner, Richmond, Va., on the brief) for appellants.

Edward A. Marks, Jr., Richmond, Va., (Sands, Marks & Sands, Richmond, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BOREMAN, District Judge.

BOREMAN, District Judge.

This appeal arises out of the consolidated trial of five actions on basic fire insurance policies. The issue presented concerns the construction and application of a policy endorsement extending coverage of each policy to loss by windstorm and hail. After the presentation of the plaintiffs' evidence, the District Court granted the motion of the defendants for a directed verdict, and from this action of the Court the plaintiffs below appeal.

On the morning of January 21, 1957, water was discovered pouring through the ceilings and floors of plaintiffs' building located at 800–804 East Broad Street, Richmond, Virginia. After the water in the building had been turned off, it was determined that the water pipes in the attic space had burst in a number of places as a result of the freezing of the water in the pipes. Inspection revealed that the cover for the hatch leading from the attic space to the roof was partially displaced.

On January 10, 1957, there had been a windstorm during which the winds had reached the velocity of 50 miles per hour. Beginning on the following day, there was a period of freezing weather, culminating on January 18 with a minimum temperature of zero degrees Fahrenheit. Subsequently, the weather moderated gradually until the pipes, which had frozen and burst during the cold spell, thawed, resulting in the release of the water through the holes in the ruptured pipes. Under these facts the plaintiffs sought in the District Court to recover for the damage caused to the interior of the building by the water.

The policies under which recovery is sought are standard fire insurance policies with identical extended coverage endorsements, the pertinent parts of which read as follows:

"Extended Coverage * * *—

"In consideration of premium for this Extended Coverage * * *, the coverage of this policy is extended to include direct loss by WINDSTORM, HAIL, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, * * *.

* * * * * *

"Provisions Applicable Only to Windstorm and Hail: This Company shall not be liable for loss caused directly or indirectly by (a) frost or cold-weather or (b) ice (other than hail), snow storm, sleet, waves, tidal wave, high water or overflow, whether driven by wind or not.

"This Company shall not be liable for loss to the interior of the building or the property covered therein caused (a) by water, rain, snow, sand or dust, whether driven by wind or not, unless the building covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct

force of wind or hail and then shall be liable for loss to the interior of the building or the property covered therein as may be caused by water, rain, snow, sand or dust entering the building through openings in the roof or walls made by direct action of wind or hail or (b) by water from sprinkler equipment or other piping, unless such equipment or piping be damaged as a direct result of wind or hail."

The plaintiffs contend that they sustained loss to the interior of their building caused by water from piping which had been damaged "as a direct result of wind". The theory upon which this contention is based is that during the windstorm of January 10, the hatch cover on the roof had been blown off by the wind, thereby exposing the water pipes near the opening to other strong cold winds which trained and concentrated upon them and caused them to freeze and burst. Thus, there are two incidents which the plaintiffs argue are attributable to direct action of wind: (1) The removal of the hatch cover by the force of the wind, and (2) the blowing of wind upon the pipes through the partially open hatch.

■ With respect to the removal of the hatch cover by the windstorm of January 10, the only evidence in the record is to the effect that there was a windstorm on that date, that the winds thus generated were of sufficient force to have removed the hatch cover, and that the cover was found partially displaced on the day the water damage occurred. There is no evidence tending to show that the cover was in place on the hatch just prior to the windstorm; nor, in fact, is there any evidence as to when the cover was last known to be in place or that it was *ever* in its proper position. There is no evidence of non-access by human agency. This state of the evidence shows no more than a possibility that the wind removed the hatch cover; and it is well settled that the trier of fact will not be allowed to guess or speculate on mere possibilities, but must be furnished with

probabilities. Moore v. Chesapeake & O. Ry. Co., 1951, 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547; Baltimore v. Louisville & N. R. Co., 4 Cir., 1944, 146 F.2d 358. Furthermore, even if the plaintiffs had offered sufficient evidence to show that the wind dislodged the cover, such action of the wind was too remote from the actual damage to fall within the coverage of the policy. In this reasoning the Court is persuaded by the holding in the strikingly similar case of Williams v. Liberty Mut. Fire Ins. Co., 1956, 334 Mass. 499, 135 N.E.2d 910.

■ Consideration is next given to the appellants' contention that wind blowing on the pipes through the open hatch in the roof was the direct cause of the loss and, therefore, within the coverage of the policy. Although the appellate court in the Williams case, supra, quoted, without disapproval, the dictum of the trial court to the effect that such circumstances, had they been proved there, *would* constitute direct action of the wind within the meaning of the policy, we cannot subscribe to this viewpoint. The policy provision in question is an extension of a basic fire insurance policy intended to extend coverage, by its express terms, to loss or damage directly attributable to "windstorm". Cf. Unobskey v. Continental Ins. Co., 1952, 147 Me. 249, 86 A.2d 160; Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., Mo.App.1948, 210 S.W.2d 700; National Fire Ins. Co. v. Crutchfield, 1914, 160 Ky. 802, 170 S.W. 187, L.R.A.1915B, 1094.

■ Although, as contended by the appellants, when the terms of an insurance policy are ambiguous the policy must be construed most strongly in favor of the insured, where no such ambiguity exists, the terms of the policy are to be taken and understood in their ordinary sense and the policy must receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties. See 29 Am.Jur., Insurance, §§ 158, 159, 166 (1940), and the many cases there cited. The District Judge gave effect to this rule of reasonable construction when he stated, "Direct

wind damage certainly could not be construed as a frozen pipe. The wind might have blown in this hatchway all summer and done no damage to the pipe. Damage to the pipe from the wind does not mean, in my view of it, a frozen pipe".

It is the opinion of this Court that the term "wind damage", or "loss as a direct result of wind", embodied in a provision insuring against damage by windstorm, if taken and understood in its plain, ordinary and popular sense, connotes damage due to the strength or *force* of the wind.

It is significant to note that the Court has been unsuccessful in finding any case granting recovery on a wind damage insurance policy wherein the violent and forceful action of the wind was not involved, nor has such case been cited. The various judicial definitions of the term "windstorm" all emphasize, exclusively, the violent, turbulent and forceful qualities of the phenomenon. See, for example, Queens Ins. Co. of America v. Larson, 9 Cir., 1955, 225 F.2d 46, wherein it was held that, under such a provision, "windstorm" means wind of extraordinary or unusual violence, such as that which is capable of damaging the insured property. Another frequently used definition is that "windstorm", within the meaning of a windstorm policy, means a wind of unusual violence, something more than an ordinary gust of wind or current of air, no matter how long continued, and must assume the aspects of a storm. Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., supra; Jordan v. Iowa Mut. Tornado Ins. Co., 1911, 151 Iowa 73, 130 N.W. 177. See, also, Unobskey v. Continental Ins. Co., supra.

A further indication as to what was intended by the particular provision in question is found in the words near the mid-point of the provision hereinbefore quoted to the effect that there was to be no coverage of damage to the interior of the building caused by water, rain, etc., unless the building "shall first sustain an actual damage to roof or walls by the direct *force* of wind or hail * * *". (Emphasis supplied). The theory of the appellants is not premised on the strength or force of the wind on the pipes but on the chemical or physical properties of moving air in that it will absorb and carry away heat, thus facilitating the process of freezing. Such strained or forced constructions of insurance contracts are to be avoided. 29 Am.Jur., Insurance, § 158 (1940).

There is, therefore, no legal basis for recovery on the policies in question under the circumstances here presented. We approve of the action of the District Court in removing the case from consideration of the jury and directing a verdict. Accord, Chesapeake & O. Ry. Co. v. Martin, 1931, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983.

Affirmed.