JAY BEE WAREHOUSE COMPANY, Plaintiff-Appellee,

v.

AMERICAN EAGLE FIRE INSURANCE COMPANY et al., Defendants-Appellants.

No. 12609.

United States Court of Appeals Seventh Circuit.

Sept. 23, 1959.

Rehearing Denied Nov. 6, 1959.

Jerome H. Torshen, Donald N. Clausen, Herbert W. Hirsh, John P. Gorman, Clausen, Hirsh, Miller & Gorman, Chicago, Ill., for defendants-appellants.

Lawrence P. Hickey, William J. Friedman, Burton H. Young, Young & Hickey, Friedman, Zoline & Rosenfield, Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

DUFFY, Circuit Judge.

This action was brought to recover on five policies of insurance providing coverage against loss by the peril of windstorm. A jury rendered a verdict for the plaintiff and judgment was entered thereon.

The policies covered a group of buildings most of which were one story in height, and were located at the corner of South Wallace Avenue and West 41st Street in the city of Chicago. This location is in the south central part of the city and about seven miles distant from Midway Airport where weather observations are made daily.

A diagram of the buildings received in evidence designated such buildings by letters "A" through "G". The damage occurred on June 7, 1953, at about 8:00 p. m. to the building designated as "D".

"Building D" was a single story structure approximately forty to fifty years old. It was rectangular in shape, measuring 124 feet on its north and south sides, and 82 feet on its east and west sides. The north, south and west walls were common walls with the buildings immediately adjacent, and were constructed of common brick. The east wall which collapsed and which fronted on Wallace Avenue, was constructed of four inches of pressed brick and eight inches of common brick.

The roof of "Building D" was supported on wooden joists which, in turn, were supported by five wooden bow-string trusses which ran in a northerly and southerly direction, and were spaced about twenty feet apart. The terminal ends of the trusses rested in pockets in the common brick walls at the north and south sides of the building. The ends of the trusses were supported by pilasters of common brick. The trusses were constructed of two members, the upper, which formed the bow of the truss, is referred to as the top chord, and the lower member running straight across from the north to the south wall is called the bottom chord, and forms the string to the bow. The vertical members within the truss itself, sometimes referred to as web members, are used to separate the top chord from the bottom chord of the truss. Their primary function is to keep the top chord in proper relationship to the bottom chord. The five wooden trusses which supported the roof were connected to one another by cross bracing. This consisted of beams extending the length of the building in an easterly and westerly direction connecting one truss to the other.

The contour of the roof followed the contour of the bow-string trusses except for two monitor type sky lights rising

about six feet above the roof contour. The walls of the sky light were perpendicular to the roof. These sky lights ran parallel to each other in an easterly and westerly direction. They were 114 feet in length and 16 feet in width. There was no lateral bracing of the top chords of the trusses in "Building D" over the widths of the two sky lights, a total of 32 feet.

Both sides agree that on Sunday, June 7, 1953, there was no evidence of excessive winds, squall lines or frontal passages in the Chicago area which could have caused winds with high velocities. The average speed of the wind on this date was 8.3 miles per hour.

On Saturday, June 6, 1953, the winds were moderate, the maximum gusts being 18 miles per hour, and an average wind speed of 7.1 miles per hour was recorded at Midway.

Plaintiff relies upon the wind conditions on June 4 and 5, 1953, as the cause of the collapse of the building. On June 4, a temperature of 95.9 was recorded in the Chicago area, the highest ever recorded on that date. At about 10:00 p. m., a squall zone approached the Chicago area bringing thunderstorms, the first storm reaching Midway Airport area shortly after 10:00 p. m., and this storm produced rainfall until approximately 12:30 a. m. the following morning. The passage of the thunderstorm was accompanied by a maximum gust of 49 miles per hour. This peak lasted for eighty seconds. The rain stopped at approximately 12:30 a. m. on the morning of Friday, June 5. At 2:50 a. m. another storm reached Midway. The maximum gusts during this storm were 29 miles per hour. A third thunderstorm producing rain at Midway from 2:19 p. m. to 5:10 p. m. was accompanied by stronger winds, the maximum gust reaching 40 miles per hour.

Much controversy centers on the testimony of Mrs. Phyllis Cox who, with her husband, is a proprietor of a tavern located across the street from "Building D." Mr. and Mrs. Cox resided in a rear first floor apartment in the building. No

other eye witnesses testified as to weather conditions from June 4 to 7, in the neighborhood of the corner of West 41st Street and South Wallace Avenue in Chicago. There was no evidence, except for the collapsed building and Mrs. Cox's statement, that a windstorm had visited that vicinity. There had been no damage to wooden fences, TV antennas, chimneys, roofs or other parts of any other building in the vicinity. However, Mrs. Cox testified the period before the collapse of "Building D" had been very windy, and she was unable to wash windows on Thursday because she was scared to use a ladder in the high wind. She said it was the same way Friday and Saturday, and that the tar paper on the roof of the garage blew off. She admitted she had talked with the president of the plaintiff the night before the trial opened when he came into her tavern to buy cigarettes.

■ It is not strange that defendants considered the testimony of Mrs. Cox as suspect. More than three years before the date of the trial, she had given a statement in the presence of a court reporter who took notes. She then stated she didn't recall any particularly heavy gust of wind in the week prior to the collapse of "Building D" and stated that there had been no major repairs to her house because of winds. However, this matter of impeachment was before the jury. The court reporter read to the jury the entire transcript of the interview. Whether her trial testimony should be believed became a matter of credibility, and that was a question for the jury.

■ Defendants claim Mrs. Cox's testimony should not have been received because her name was not furnished in answer to an interrogatory asking the names of witnesses to the alleged windstorm. Plaintiff did not give the name of any witness, but referred to newspaper accounts of windstorms in the Chicago area which appeared in Chicago newspapers on June 5 and 6, 1953.

At a conference with the District Judge, plaintiff's counsel stated he did

not intend to mention newspaper accounts, but that he had been informed of the existence of a witness whose name he had not yet received. This witness turned out to be Mrs. Cox.

Plaintiff's counsel testified that he had not known about her or talked to her prior to the evening preceding the day when she was called upon to give her testimony. The Court considered the situation and apparently concluded that plaintiff's counsel did not know about Mrs. Cox prior to the time when he made his statement in court. We cannot say that the District Judge's determination of this question was reversible error.

■ Plaintiff presented the testimony of John R. Murray, a consulting meteorologist. He examined the local climatological sheet for June, 1953, as well as official United States Government Synoptic Weather Maps and other pertinent charts and data on file at the Federal Records Center of Chicago for June 4, 5, 6 and 7, 1953. Although the "fastest mile" measured at Midway on June 4 was 50 miles per hour, Murray testified it was apparent from the indicated degree of instability on June 4 in other locations in Chicago, that gusts of wind in such areas probably exceeded 50 miles per hour. He testified also that the squall line on June 5 revealed an uninterrupted line of thunderstorms across the entire Chicago area. This squall line moved across the city from a westerly or northwesterly direction.

Mr. Murray testified it was an established concept of meteorology that the intensity and violence of a thunderstorm, and the proximity to the core thereof, is shown by an accompanying intensity of precipitation. He pointed out that the precipitation at the University of Chicago station, about three miles distant from the collapsed building, was much heavier than at Midway which was seven miles distant. He concluded the winds at the University of Chicago station were of greater intensity than those recorded at Midway.

There was also evidence of a storm of tornadic character in suburban Highland Park. But this evidence could not be considered of much weight as Highland Park is twenty miles distant from "Building D."

Plaintiff also presented testimony of a consulting structural engineer who, in response to a hypothetical question, testified the winds described could have caused the collapse of the building. He also stated that a building in a condition at the brink of collapse, might be caused to collapse by a mild wind blowing in the opposite direction for a day or two.

Plaintiff offered the testimony of an experienced architect. He inspected "Building D" after the collapse for the purpose of making an inspection. He testified he found no dry rot, and no deterioration of lumber in the building outside of ordinary wear and tear. He stated as his opinion that the velocity of the high winds prior to the collapse caused the collapse due to the unique construction of the roof of "Building D" which was a target for the winds.

■ In considering whether there was sufficient credible evidence to support the verdict and judgment, we must, of course, interpret such evidence in the light most favorable to the plaintiff. Gearhardt v. American Reinforced Paper Co., 7 Cir., 244 F.2d 920, 922.

We have set forth plaintiff's evidence in some detail to demonstrate that the evidence in this case is sufficient to support the verdict and judgment.

■ Defendants urge that testimony of the experts was not admissible as invading the province of the jury. Objection also is made as to the form of the hypothetical question. We have considered these objections and hold that they are without merit.

The defendants also claim error in the definition of "windstorm" which the Court gave in his instructions to the jury. The same instruction was approved in Queen Insurance Company of America v. Larson, 9 Cir., 225 F.2d 46, 52. Although the definition could have been couched in different language, we find no error in the instruction as given.

The issues in this case were close. From the evidence the jury might have reached a different conclusion as to the cause of the collapse of "Building D." However, our area of review is limited because we are convinced there is sufficient credible evidence in this record to support the verdict and judgment for the plaintiff.

Affirmed.