**COMMERCIAL CARVING COMPANY**
and The State Commercial Bank,
Plaintiffs,

v.

**MANHATTAN FIRE AND MARINE
INSURANCE COMPANY et al.,**
Defendants.

No. C–103–S–58.

United States District Court
M. D. North Carolina,
Salisbury Division.

March 10, 1961.

McLennan & Surratt, Winston-Salem,
N. C., Wilson & Saintsing, Thomasville,
N. C., and Stoner & Wilson, Lexington,
N. C., for plaintiffs.

Jordan, Wright, Henson & Nichols, Greensboro, N. C., Helms, Mulliss, McMillan & Johnston, Charlotte, N. C., and Roberson, Haworth & Reese, High Point, N. C., for defendants.

EDWIN M. STANLEY, District Judge.

The plaintiffs seek the recovery of windstorm losses which were allegedly sustained during the early morning hours of November 23, 1957, on the premises of the plaintiff, Commercial Carving Company, near the city limits of Thomasville, North Carolina.

At the time of the loss, the plaintiff, Commercial Carving Company, was the owner of a carving and furniture manufacturing plant, subject to a lien upon the buildings and equipment held by the plaintiff, The State Commercial Bank, and the parties stipulated that in the event the defendants are adjudged to be liable for the payment of any amount, the recovery should be jointly on behalf of both plaintiffs and distributed between them in such manner as they might agree.

Prior to November 23, 1957, each of the defendants had duly issued and delivered to the plaintiffs policies of fire and extended coverage insurance, and the parties stipulated that the premiums had been paid and that each of said policies was in full force and effect at the time of the alleged loss.

The plaintiff, Commercial Carving Company, alleges that several of its buildings and much of its equipment were damaged by windstorm, one of the perils enumerated in the policies of insurance. The defendants deny that windstorm was the dominant and efficient cause of any damage and loss sustained by the plaintiffs, and further deny that two of the three proofs of loss were filed within the time prescribed by the policies of insurance.

The parties further stipulated that the case should first be tried on the issue of liability, and in the event the defendants should be found liable for any of the damage sustained by the plaintiffs,

consideration would then be given to referring the matter to a Special Master for the ascertainment of the amount of the damage.

The case was tried by the court without a jury. At the conclusion of the trial, the court took the case under advisement pending receipt of requests for findings of fact and conclusions of law, and briefs of the parties in support of their contentions.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, stipulations, exhibits, briefs and oral arguments of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

Findings of Fact

1. The plaintiff, Commercial Carving Company, hereinafter referred to as the "Carving Company," is a North Carolina corporation with its principal office and place of business in Davidson County, North Carolina.

2. The plaintiff, The State Commercial Bank, hereinafter referred to as the "Bank," is a North Carolina banking corporation with its principal office and place of business in Davidson County, North Carolina.

3. Each of the defendants is incorporated under the laws and maintains its principal place of business in states other than North Carolina.

4. The amount in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

5. On November 23, 1957, the Carving Company was the owner, subject to a lien held by the Bank, of a carving and furniture manufacturing plant located near the city limits of Thomasville, North Carolina, consisting of several buildings upon a tract of land lying along the northern side of the High Point, Thomasville and Denton railroad tracks. The railroad tracks run in a general east-west direction.

6. The Carving Company's offices, main carving plant, boiler room and dry

kilns were situated in a connected group of buildings runnings generally adjacent to and parallel with the railroad tracks. This group of buildings will hereinafter be referred to as the "Office Building."

7. Another series of buildings was located approximately twenty-five to thirty feet north of and parallel with the office building. This series of buildings consisted of a cabinet and finishing room approximately 34 feet by 480 feet in size, hereinafter referred to as the "Cabinet Building," and a solite block warehouse building approximately 64 feet by 80 feet in size, hereinafter referred to as the "Warehouse Building." The warehouse building was immediately west of the cabinet building.

8. To the north of the second series of buildings there was also located three other buildings, one of solite block construction.

9. To the west of the office building there were situated several piles or stacks of lumber, and to the west of the warehouse building there was located a small frame shack which housed a fire hydrant and hose. In the same general area was another frame building, with a tar-paper exterior or siding, which contained electrical equipment.

10. The most recently constructed of the buildings were the warehouse building and the other solite block building north of the warehouse building. These buildings were constructed in 1956 and 1957, and most of the work was done by employees of the Carving Company, although a masonry contractor was employed to lay-up the solite blocks in both buildings.

11. The warehouse building contained a full basement with a concrete floor, and the building was constructed on the slope of a hill so that the west wall of the basement was above grade. The west wall contained two entrance doors, one at the north-east end and one at the north-west end of the basement wall. Against the south wall of the basement the Carving Company had back-filled approximately to the top of the basement wall with earth, after first installing terra cotta drain pipes in gravel and cinders at the bottom of the wall adjacent to the footings. The basement wall was constructed of 12 inch solite blocks with no reinforcement therein. No pilasters or piers were constructed in or against any portion of the basement wall. The upper story of the building was constructed of 8 inch solite blocks. The floor of the upper story rested on 1⅝ inch by 9¼ inch floor joists, 24 inches on center, the ends of which lay directly on the top course of the 12 inch block without any plate thereunder. The floor of the upper story was also supported by three girders running lengthwise of the building, the girders consisting of four 2 inch by 12 inch timbers glued and nailed together and resting upon 4 inch iron pipes. There were three of these supporting girders approximately 15 feet apart under the floor of the upper story. The floor was constructed of 2 inch planks. At the west end of the south wall there was located a corrugated iron door providing entrance from the exterior of the building into the upper story. This door was arranged to slide upon rails from which it was hung. Along the south wall the earth had been back-filled so that there was a slight indention or ditch for surface drainage. There were no windows or other openings in the wall of the warehouse building. The roof of the building was constructed of wood tacked on 2 inch by 8 inch wood rafters, 24 inches on center, and covered with asphalt rolled roofing. The roof was an ordinary gable roof with the gable running lengthwise of the building. The roof rafters rested directly on the next-to-the-top course of 8 inch solite blocks. The top course of the solite blocks was between the ends of the roof rafters. There was also an entrance into the warehouse building on the east side, this entrance being from what is referred to as the gangway connecting the warehouse building to the cabinet building. The basement wall was about 8 feet 4 inches in height and the upper story wall was about 12 feet in height, except

the east and west walls of the upper story were built up to the peak of the roof gable, the total height of the east and west walls at the peak of the roof gable being approximately 25 feet. The building was heated by steam pipes which were connected to home-made radiators, the pipe of the radiators being hung underneath the floor joists which supported the floor of the upper story. There were no roof gutters on the building.

12. The office building had a 5-ply built-up asphalt rolled roof, upon the top of which there had been placed a layer of what the witnesses referred to as tin foil or aluminum foil roofing. This foil layer was not roofing material to keep water out but was used to reflect heat away from the roof. Prior to November 23, 1957, at least the top foil layer of the roof had been deteriorating, and from time to time, when employees of the Carving Company went upon the roof to sweep off the dust and shavings which had accumulated through the malfunction of the dust collector, pieces of tin foil or aluminum type paper roof would be swept off the roof.

13. Prior to November 23, 1957, each of the defendants had duly issued and delivered to the plaintiffs policies of fire and extended coverage insurance covering the various buildings, inventory, equipment and supplies of the Carving Company. The premiums had been paid and each of the policies of insurance was in full force and effect on November 23, 1957.

14. Under the extended coverage endorsements attached to and made a part of each of the policies of insurance, the policies provided coverage against " * * direct loss by Windstorm. * * * " Each of the policies also provided that the insurance companies:

"* * * shall not be liable for loss to the interior of the building or the property covered therein caused, (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct force of wind or hail and then shall be liable for loss to the interior of the building or the property covered therein as may be caused by rain, snow, sand or dust entering the building through openings in the roof or walls made by direct action of wind or hail or (b) by water from sprinkler equipment or other piping, unless such equipment or piping be damaged as a direct result of wind or hail."

Each of the policies further provided that:

"The insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, cost, actual cash value and the amount of loss claimed; *and within sixty days after the loss,* unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured. * * * " (Emphasis supplied.)

15. During the week of November 18, 1957, there had been considerable, but not an unusual, amount of rainfall in the vicinity of Thomasville, North Carolina. The official records at the Greensboro-High Point Airport weather station, which is some 18 miles from Thomasville, indicated that there was .11 of an inch of rain on November 18, 1 inch on November 19, .48 of an inch on November 22, and .99 of an inch on November 23. The rainfall was general for the area and these records fairly indicated the rainfall in the vicinity of Thomasville. No rainfall was recorded on either November 20 or November 21. During the entire day of November 22 and the first two hours of November 23, .65 of an inch of rainfall was recorded.

16. Between 1:30 and 2:00 on the morning of November 23, 1957, there oc-

curred a thunderstorm in the vicinity of Thomasville accompanied by lightning and high, gusty and tumultuous wind. The wind was blowing from the south-southwest to the north-northeast at the premises of the Carving Company. The wind was of sufficient velocity to blow a night watchman down in the driveway between the cabinet building and the office building and blow him 20 feet before he could regain his balance, making it necessary for him to crawl on his hands and knees along the ground to shelter in the office building. At about the time the night watchman was blown to the ground, a loud noise, which sounded like a dynamite explosion, was heard in the vicinity of the warehouse building. A short time later, it was discovered that from 35 to 40 feet of the second floor south wall of the warehouse building had collapsed, and that this had resulted in the breaking of steam pipes inside the building, releasing steam. A portion of the roof of said building dropped a distance of from 2 to 3 feet.

17. Sometime during the night of November 22 and November 23, a steel smokestack, ⁹⁄₁₆ of an inch thick, 36 inches in diameter, approximately 75 to 80 feet high, supported by seven guy wires, and located at the plant of Economy Hosiery Finishers some 1,000 feet southwest of the Carving Company premises, buckled about 25 to 30 feet from the ground. The smokestack fell in a northeastern direction and toward the southwest corner of the Carving Company premises.

18. Upon the occasion of the windstorm, there were some 35 to 40 stacks of lumber, approximately 8 feet high, in the lumber-yard. Shortly after damage to the south wall of the warehouse building, a portion of the stacked lumber was found to have blown to the ground in the direction and area of the driveway between the office building and the warehouse building. The roof, coping and flashing on other buildings were damaged to some extent. There was only a small amount of water in the basement of the warehouse building immediately after the wall fell, a part of which came from the broken steam pipes.

19. The buildings of the Carving Company were inspected for insurance by engineers of the defendants, and by the North Carolina Rating Bureau, and passed for insurance.

20. On several occasions much more rain had fallen on the premises of the Carving Company, and over relatively the same period of time, than had fallen immediately prior to the damage of the buildings during the early morning hours of November 23, 1957, and no damage had occurred to said buildings on such occasions.

21. On the night of November 23, 1957, there was stacked a large quantity of lumber upon the wooden floor of the upper story of the warehouse building. The total weight of the lumber was estimated at 22,848 pounds, most of which was concentrated along the south wall of the building, but this weight was about 1,000 pounds less than the maximum load which was customarily stored on this floor.

22. While the back-fill soil adjacent to the south basement wall of the warehouse building was undoubtedly wet and saturated to some extent, the warehouse building had been planned and constructed in such a manner as to afford good drainage. At the time the building was constructed, a drainage ditch was dug about 10 inches below the south wall footing, about 5 or 6 inches of cinders was placed therein, drainage tile was then placed, and some 12 inches of crushed stone was placed on top of the tile. Some 2 to 2½ feet of cinders was then placed on top of the crushed stone, and the remainder of the basement wall was back-filled with earth.

23. While the evidence, including expert testimony, is conflicting, it is found by a preponderance of the evidence that the south wall of the warehouse building collapsed as the direct result of the force and stress of wind against the upper story, and that the basement wall thereafter caved in.

24. On the morning of November 23, 1957, officials of the Carving Company notified the writing agent of the defendants that the wall of the warehouse building had collapsed, and the agent, in accordance with general instructions which he had previously received from the defendants, reported the matter to the High Point office of the General Adjustment Bureau, Inc., in order that representatives of the Bureau might promptly begin an investigation. Later that day, Bureau adjusters went to the premises of the Carving Company and inspected the damaged buildings and surroundings, including some of the contents of the buildings. After making a preliminary investigation, one of the adjusters expressed the opinion that the damage to the warehouse building and its contents was not caused by windstorm and, therefore, not covered under the terms of the policies of insurance written by the defendants, but the other adjuster expressed the opinion that such damage had been caused by windstorm and was covered under the policies. However, the question of whether liability was to be accepted or denied was left open at that time, and the writing agent was instructed to obtain photographs of the damaged building and the president of the Carving Company was requested to compile information as to the amount of the loss.

25. On or about December 12, 1957, the Carving Company furnished General Adjustment Bureau, Inc., an itemized statement of the amount of the loss which the Carving Company contended it had sustained as a result of the collapse of the south wall of the warehouse building, the total being the sum of $65,935.09. In accepting this statement, the filing of a sworn proof of loss with respect to the original claim in the sum of $65,935.09 was waived by the defendants, and the defendants do not contend to the contrary.

26. The total original claim in the sum of $65,935.09 involved only damage to the warehouse building and its contents, including the labor cost of moving the damaged merchandise out of the building, cables used to brace the building, tarpaulins which were erected over the open area where the wall collapsed, and raincoats which were used by some of the workmen while erecting the tarpaulins and moving the damaged merchandise out of the building. The claim did not include any alleged loss or damage for the office building or any of the contents therein.

27. Thereafter, on or about February 14, 1958, and more than 60 days after the loss had occurred, the Carving Company delivered to General Adjustment Bureau, Inc., another itemized statement of alleged loss in the total sum of $87,547.31. This second itemized statement included the original claim of $65,935.09, and additionally, included a claim for damages to the office building, fees for professional services, reworking and replacing certain master patterns, and other miscellaneous items.

28. Thereafter, on or about April 4, 1958, the Carving Company delivered to the writing agent of the defendants a third itemized statement of alleged loss in the total sum of $110,380.81. This third itemized statement included the amounts claimed in both the first and second itemized statements. The only difference between the second itemized statement and the third itemized statement is the third itemized statement changed the figure for reworking and replacing master patterns from $9,170.00 to $32,003.00. Sometime thereafter, the writing agent delivered the third itemized statement to a representative of General Adjustment Bureau, Inc.

29. The second and third itemized statements of alleged losses were not sworn to by any representative of the Carving Company and were not delivered to the defendants, or any of their representatives or agents, within 60 days after the loss. The time for furnishing proofs of loss was never extended in writing by the defendants.

30. During the latter part of February, 1958, a representative of General Adjustment Bureau, Inc., was in Thomasville, at which time he was advised that

the Carving Company was planning to file suit against the defendants for the purpose of recovering the damages to its plant and inventory which occurred during the early morning of November 23, 1957. The representative requested that he be given an additional 10 or 12 days within which to determine whether the defendants would accept or deny liability. Up to that time the defendants had not denied liability to either of the plaintiffs. The first time the defendants actually denied liability for any of the losses sustained by the Carving Company was in their answer filed on June 16, 1958.

31. While the second and third itemized statements submitted by the Carving Company included certain alleged damages to the office building and master patterns stored therein, it was not until sometime after this action was commenced that representatives of General Adjustment Bureau, Inc., became aware of the fact that the damaged master patterns were located in the carving plant portion of the office building. The representatives were under the impression at all times during their investigation that the master patterns had been stored in some portion of the warehouse building where the wall collapsed.

### Discussion

The principal questions for determination are (1) whether the plaintiffs suffered any "direct loss by windstorm" upon the occasion in question, and (2) whether there was a waiver of policy requirements with respect to the proofs of loss filed on February 14, 1958, and April 4, 1958. It is conceded that the first proof of loss filed on December 12, 1957, substantially complied with the policy provisions.

In order for the plaintiffs to prevail with respect to the damage claimed in any of the proofs of loss timely filed, they are only required to establish by a preponderance of the evidence that windstorm was the dominant and efficient cause of the damage. Recovery cannot be defeated by showing that there may have been other contrib-uting causes. 5 Appleman Insurance Law and Practice, Section 3142; Miller v. Farmers Mutual Life Insurance Association, 1930, 198 N.C. 572, 152 S.E. 684. The term "direct loss by windstorm" is held to mean "damage due to the strength or force of the wind." Abady v. Hanover Fire Insurance Co., 4 Cir., 1959, 266 F.2d 362, 365.

The plaintiffs contend that a preponderance of the evidence establishes that windstorm was the dominant and efficient cause of their damage to the warehouse building, and that the south basement wall of this building caved in only after the wind had blown in the upper story wall. On the other hand, the defendants contend that the evidence reasonably shows that the basement wall first collapsed by reason of earth pressure against the solite blocks, and that the upper story collapsed by reason of the failure of the basement wall.

Both parties offered expert testimony in an effort to establish which wall, the basement or upper story, first collapsed, and as to the dominant and efficient cause of the collapse. Each expert reached an opposite conclusion. The conclusions were arrived at from weather data furnished by nearby meteorologists, the physical damage to the warehouse building, the type and condition of the soil used to back-fill against the basement wall, the drainage below the basement floor, the increased pressure exerted against the wall by water saturation, the type and construction of the wall, and other related factors. The defendants stressed the fact that the wall which collapsed was the least exposed to the wind and the most exposed to hydrostatic pressure. The plaintiffs offered evidence of a thunderstorm and high, gusty winds in the area.

There is no doubt but that the wind velocity was sufficient to blow the night watchman down in the driveway and blow him about 20 feet before he could regain his balance, and that it was necessary for him to crawl on his hands and knees along the ground to reach shelter in the office building. He reported such

to his superior a few minutes after the occurrence, and again to the President of the Carving Company the following morning. On the following Monday, November 25, 1957, he made a written report of the occurrence to the adjusters for the defendants. One of the experts for the defendants stated that this would require a wind velocity up to 90 or 100 miles an hour, and another expert for the defendants testified that a wind velocity of 75 miles per hour would be considered of hurricane force and sufficient to blow the wall down. Additionally, there was uncontradicted evidence that the wind was of sufficient force to blow lumber from the lumber stacks and do considerable roof damage to the buildings. The heavy steel smokestack at another building about 1,000 feet away buckled during the same night. Other witnesses testified concerning a thunderstorm and high winds in the area during the night of November 23. Further, an expert meteorologist stationed at Greensboro-High Point Airport testified that during the early hours of November 23 there was a rapid, unsteady fall of the barometric pressure which indicated turbulence and general upheaval over a wide area, and that turbulence and upheaval of this type could be expected to produce localized thunder, lightning and windstorms. It is also significant that the rainfall preceding the failure of the building wall was much less than on several previous occasions, and that the earth pressure on the basement wall had reached the same or a greater value many times before, without the wall collapsing.

■ It is concluded that the plaintiffs have established by a preponderance of the evidence that the upper story south wall of the warehouse building first collapsed as a direct result of the force and stress of wind, and that the basement wall thereafter collapsed due to earth pressure and the heavy impact resulting from the falling of the upper story wall. It is further concluded that the property located in the interior of the warehouse building was damaged by rain which directly entered the building through openings in the roof and south wall made by direct action of wind.

We turn now to the question of whether there was a waiver of policy requirements with respect to proofs of loss filed on February 14, 1958, and April 4, 1958, both dates being more than 60 days after the loss. The plaintiffs allege that the Carving Company furnished the defendants with "proofs of loss from time to time as same could be ascertained." The defendants denied liability for the first time in their answer which was filed on June 16, 1958. The plaintiffs do not attempt to explain the delay in filing proofs, except such delay as was caused by the burden of ascertaining the amount of damage.

■ It is uniformly held that a denial of liability by an insurer, *made during the period prescribed by the policy for the presentation of proofs of loss*, and on grounds not relating to the proofs, constitutes a waiver of the provisions of the policy requiring proofs to be presented, the reason being that since the insurer has rejected the claim, the presentation of proofs of loss would be a meaningless gesture.

The rule is stated in 29A Am.Jur., Sections 1431 and 1432 as follows:

"A denial of liability by an insurer, *made during the period prescribed by the policy for the presentation of proofs of loss*, and on grounds not relating to the proofs, will ordinarily be considered a waiver of the policy requiring the proofs to be presented, or a waiver of the insufficiency of the proofs or of defects therein. The denial of liability is equivalent to a declaration that the insurer will not pay although proofs are furnished in accordance with the policy, and the law will not require the doing of a vain or useless thing * * *." (Emphasis supplied.)

* * * * * *

"The general rule that a denial of liability by an insurer on grounds not relating to proofs of loss will

·ordinarily operate as a waiver of policy provisions requiring the pres-·entation of such proofs or of defects or insufficiencies in proofs presented refers, in the exact form in which it has been stated by many courts, to a denial of liability *made during the period prescribed by the policy for the presentation* of proofs of loss * * *." (Emphasis supplied.)

In 5 Appleman Insurance Law and Practice, Section 3631, the following appears:

"It has been stated generally that an insurer denying liability upon a loss waives irregularities and formal defects in the proofs thereof. Likewise, the rejection of a claim for loss or the outright denial of liability has been held to excuse the failure to furnish proofs of loss at all. In some instances, this result is particularly indicated by statute.

"Many decisions have even stated these results conjunctively, that a denial of liability will prevent the insurer either from relying upon the failure to furnish proofs as a defense to liability, or from relying upon defects in those furnished for that purpose. The important qualification has been added in many states, however, that the failure to furnish proofs of loss is excused *if the denial is made within the time given by the policy for the furnishing of proofs.* Thus, if the insurer does not deny liability until after the time thus given has expired, the failure is not excused, and recovery generally cannot be had * * *." (Emphasis supplied.)

▐▌▌ North Carolina, by whose decisions we are bound in this diversity suit, seems to have adhered to the rule that the failure to furnish proof of loss is excused only if denial of liability is made during the period prescribed by the policy for the presentation of proofs.

In the early case of Doggett v. United Order of Golden Cross, 1900, 126 N.C. 477, 36 S.E. 26, 28, the rule which has

been uniformly adhered to, is stated as follows:

" * * * If an insurance company should refuse to pay the amount of the policy, or deny its liability upon an independent ground, or put its refusal exclusively on other grounds, before proofs of loss are made, *and before the expiration of the time within which such proofs are, by the terms of the policy, to be made,* such denial and refusal would constitute a waiver of the condition requiring notice and proofs of loss. Such a denial and refusal would be just the same as a declaration and notice to the beneficiary that payment would not be made in any event." (Emphasis supplied.)

In Zibelin v. Pawtucket Mut. Fire Ins. Co., 1948, 229 N.C. 567, 50 S.E.2d 290, 291, it is stated:

"Unfortunately for the plaintiff, he failed to observe the terms of his policy and to comply with its plainly written provisions. The contract between the plaintiff and the Insurance Company embodied, in the standard form of fire insurance policy is one prescribed by statute G.S. § 58–177, and its provisions have been held by this Court to be valid and just to insured and insurer. Greene v. Aetna Ins. Co., 196 N.C. 335, 145 S.E. 616. The rights and liabilities of both under the policy must be ascertained and determined in accord with its terms. Lumber Mutual Casualty Insurance Co. of New York v. Wells, 226 N.C. 574, 39 S.E.2d 741; Midkiff v. North Carolina Home Ins. Co., 197 N.C. 139, 147 S.E. 812; Muse v. London Assurance Co., 108 N.C. 240, 13 S.E. 94. *There was here no denial of liability on other grounds by the Insurance Company within the time limited for filing proof of loss which would have dispensed with that requirement.* Proffitt Mercantile Co. v. State Mut. Fire Ins. Co., 176 N.C. 545, 97 S.E. 476; Gorham v. Pacific Mut. Life

Ins. Co., 2I4 N.C. 526, 200 S.E. 5. * * *" (Emphasis supplied.)

In one of the later decisions dealing with the subject, the North Carolina Supreme Court, in Gardner v. Carolina Ins. Co. of Wilmington, 1949, 230 N.C. 750, 55 S.E.2d 694, 695, expressed the North Carolina rule as follows:

"The contract between plaintiff and defendant is in the standard form prescribed by statute. G.S. § 58–177. The rights and liabilities of both parties under the policy must be ascertained and determined in accord with its terms. Zibelin v. Pawtucket Mutual Fire Insurance Co., 229 N.C. 567, 50 S.E.2d 290, and cases cited.

"Under the terms of the policy the plaintiff was required to file with defendant proof of loss within sixty days after the fire occurred, and the policy provides that unless this proof is filed within the prescribed period no suit may be maintained on the policy. Tatham & Co. v. Liverpool, London & Globe Ins. Co., 181 N.C. 434, 107 S.E. 450; Zibelin v. Pawtucket Mutual Fire Insurance Co., supra. Ordinarily, compliance with these provisions of the contract must be alleged in the complaint and proved at the hearing.

"The defendant, of course, could waive the filing of proof of loss, and it is generally held that a denial of liability by the insurer, *made during the period prescribed by the policy for the presentation of proof of loss*, on grounds not relating to the proof, will be considered a waiver of the provision requiring such proof. Gerringer v. North Carolina Home Ins. Co., 133 N.C. 407, 45 S.E. 773; Felts v. Shenandoah Life Ins. Co., 221 N.C. 148, 19 S.E.2d 259; Gorham v. Pacific Mut. Life Ins. Co., 214 N.C. 526, 200 S.E. 5; Anno. 22 A.L.R. 408. But the record fails to disclose either allegation or evidence of waiver." (Emphasis supplied.)

The requirements in the policies issued by the defendants with respect to proofs of loss are the same as the policy requirements in the Gardner case. Here, as there, "the record fails to disclose either allegation or evidence of waiver."

It is concluded that there was no denial of liability, and no evidence of any other conduct by the defendants, during the 60 day period prescribed by the policies for the presentation of proofs, that would constitute a waiver of policy requirements.

Conclusions of Law

1. That the court has jurisdiction of the parties and the subject matter herein.

2. That the policies of fire and extended coverage insurance written by each of the defendants were in full force and effect on November 23, 1957.

3. That windstorm was the dominant and efficient cause of the collapse of the south wall of the warehouse building on November 23, 1957.

■ 4. That property located in the interior of the warehouse building was damaged by rain which directly entered the building through openings in the roof and south wall made by direct action of wind

■ 5. That the itemized statement filed by the plaintiffs with the defendants on December 12, 1957, in the amount of $65,935.09, was furnished within 60 days after the loss occurred and was accepted by the defendants, and the defendants thereby waived the necessity of filing any further sworn proof of loss with respect to said claim.

■ 6. That the itemized statements or proofs of loss filed by the plaintiffs on February 14, 1958, and April 4, 1958, were not filed within the time required by the policies of insurance, and the defendants did not waive the policy requirements that the plaintiffs should furnish sworn proofs of loss in writing within 60 days after the alleged losses occurred.

7. That the plaintiffs are entitled to recover of the defendants the amount of any losses sustained to the warehouse building during the early morning hours of November 23, 1957, and the rain damage to the interior of the building and the contents therein.

Counsel for the plaintiffs will present an appropriate judgment, after having first exhibited same to counsel for the defendants for approval as to form. In the event a satisfactory settlement is not reached within 30 days from the date of the judgment, the parties shall immediately thereafter file with the court their views with respect to referring the matter to a Special Master for the ascertainment of damages.