**BEATTIE BONDED WAREHOUSE CO.,**
**a corporation, Plaintiff,**

v.

**GENERAL ACCIDENT FIRE & LIFE**
**ASSURANCE CORPORATION, LTD.,**
**a corporation, Defendant.**

**Civ. A. No. 69–237.**

United States District Court,
D. South Carolina,
Greenville Division.

July 20, 1970.

Ernest J. Howard and Lehman A. Moseley, Jr., Greenville, S. C., for plaintiff.

Fletcher C. Mann and J. Brantley Phillips, Jr., Leatherwood, Walker, Todd & Mann, Greenville, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

DONALD RUSSELL, District Judge.

In compliance with Rule 52(a), Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon in the above cause, as follows:

### FINDINGS OF FACT

1. Plaintiff is a South Carolina corporation, with its principal place of business in Greenville, South Carolina.

2. Defendant is a corporation organized and existing under the laws of a State other than South Carolina, with its principal place of business in a State other than South Carolina, and is authorized to engage in the business of writing insurance in the State of South Carolina.

3. Plaintiff is the owner and operator of certain warehouses designated by numbers 1 to 4, inclusive, and used for storage of cotton, located on Mayberry Street in Greenville, South Carolina.

4. The plaintiff's warehouse No. 1 involved in this action is embraced in a policy of insurance issued by the defendant and including within its coverage insurance "AGAINST DIRECT LOSS BY WINDSTORM, HAIL, EXPLOSION, RIOT * * *."

5. On the night of August 28, 1968, at about 10:30 p. m., the warehouse designated as No. 1 collapsed. The plaintiff seeks recovery for such loss, claiming damages in the amount of $15,000.00.

6. This warehouse had originally been located elsewhere but in 1948 was disassembled and erected at its location at the time of the collapse. Located on an incline, it consisted of two stories or levels. About 1950 and 1951, the second floor or level of this warehouse collapsed from overloading and was repaired. Other than for this work in 1950 and 1951, no repairs had been made to the warehouse following its erection in 1948.

7. For many years the warehouse was approved by the State Warehouse Commission for the storage of cotton under the provisions of the State Warehouse System. Section 69–101 et seq., Code of South Carolina (1962). The approved storage was 1750 bales for the first level and 1100 bales for the second. On August 28, there were 1100 bales stored on the first floor and 900 bales on the second floor.

8. Over the years, dry rot in an undetermined amount had accumulated on the structural pillars of the warehouse. In addition, these pillars had a certain amount of termite infestation. They were, however, substantial pillars, about 10" x 10", and the extent of damage caused by dry rot and termites to such columns was not determined.

9. Dysart, who had been manager of the plaintiff's warehouse for about three years, testified that until the afternoon of August 28, 1968, the warehouse had not leaned any, was structurally upright and gave no indication of unsteadiness.

On the other hand, he did indicate that the building had on occasions vibrated and shaken when fork-lift trucks were being used on the second-floor level. Moreover, two witnesses employed by a sprinkler company, who, in such capacity, had serviced the sprinkler system in the warehouse over the years and were very familiar with it, testified that the warehouse was "in bad shape" and that they had observed the warehouse progressively ["gradually getting worse"), leaning towards the incline on which the warehouse was situated, for more than a year. One of these employees fixed the "listing" of the warehouse at "a few degrees" "maybe a year before it actually fell over." On at least two occasions prior to their visit on the afternoon of August 28, 1968, they had been called to make adjustments to the sprinkler system required by reason of the listing or settling of the warehouse. Actually, their visit on the afternoon of August 28, 1968, was for this purpose. These two witnesses were disinterested and there is no reason to discredit their testimony. Nor, for that matter, did the manager of the plaintiff dispute their testimony that they had on at least two other occasions made adjustments in the sprinkler lay-out at the warehouse to meet the new situation caused by the settling of the warehouse or that it was for the purpose of making such adjustment that the sprinkler company employees were at the warehouse on the afternoon of August 28, 1968.

Under these circumstances, the conclusion is inescapable—and I so find as a fact—that the warehouse had been listing or settling perceptively and noticeably for a considerable period of time prior to August 28, 1968.

10. Nor had the plaintiff taken any steps to correct such listing or settling or to "brace the building or to shore up the building." One of the employees of the sprinkler company testified that on the afternoon of August 28, 1968, he pointed out to the manager of the plaintiff the "leaning condition", indicating his concern about it, and that the mana-

ger inquired "who could he get to brace it up." The employee gave the manager two names of contractors who, in his opinion, could "shore up" the buildings.

11. The evidence of the plaintiff on the nature of the wind on the afternoon of August 28, which the plaintiff contends caused the warehouse's collapse, consisted of the testimony of four witnesses:

(1) The manager of the plaintiff testified that beginning between 1:00 and 2:00 o'clock and continuing until 5:30 on the afternoon of August 28, 1968, he observed "strong, gusty winds" about the warehouse and "noticed a little swaying" in the building, which he said the employees of the sprinkler company had originally "pointed out" to him when they arrived at the warehouse.

(2) A part-time employee of the plaintiff, who visited the warehouses during this same afternoon, stated it was "windy" about the warehouse. Later she described the wind as "forceful" and added that she didn't feel that it would be "comfortable" to get out of her car. She said she noted that the wind was "having a great effect on" the warehouse. Because of the wind, she did not get out of her car but talked to Mr. Dysart in her car.

(3) Another employee of the plaintiff testified that he observed "strong gusts of wind", blowing the cotton "so bad until I (he) had to quit sampling" incoming cotton which he apparently was inspecting. He added he observed the warehouse "vibrating" and "leaning".

(4) The plaintiff called another witness who had been at the warehouse on the morning of August 28, 1968, but left about 1:00 o'clock. He observed some wind blowing some cotton off the bales. This, however, was apparently before the manager of the plaintiff contended the winds reached their intensity.

None of these witnesses for the plaintiff attempted to give any estimate of the velocity of the wind during the afternoon. Other than for some turbulence

of the cotton samples, they identified nothing about the warehouse that had been affected by the wind during that afternoon.

12. The defendant, in turn, offered the following testimony on the nature of the wind on the occasion in question:

(1) The defendant proffered the surface weather observations made at the Greenville-Spartanburg Airport and the Greenville Downtown Airport. The first of these installations was about 8 miles from the warehouse and the second about 3 miles. Both indicated winds of about 12 to 14 miles per hour, with gusts up to about 20 miles per hour at about 11:00 o'clock on the morning of August 28. From that time on, the records indicated the winds subsided gradually. These records thus reflect wind conditions at these installations different from those testified to by Mr. Dysart as occurring at the warehouse, for they indicate that the winds were subsiding, rather than increasing in volume, during the afternoon of August 28.

The plaintiff points out that the meteorological data showed that winds of 13, 14 and 18 miles per hour had been recorded on the days immediately preceding August 28. Indeed, it points to a date some nine days earlier when the wind velocity reached 30 miles per hour. The interesting fact about all this is that Mr. Dysart, who was at the warehouse, it would appear, on these days did not testify that the wind on such days represented "strong gusts" or threatened any harm to the warehouse. Actually, he singled out the wind of August 28 as the sole damaging agent, though, if the meteorological data may be regarded as indicative of wind velocity, there was little difference between the wind velocity on August 28 and that experienced repeatedly over the days prior thereto. Of course, it could be that the earlier wind may have been a contributing factor in the collapse of the warehouse, if such wind had been of such tumultuous character as to create a hazard. But, unfortunately for any such theory, the plaintiff had proffered no testimony that the earlier winds were of such proportions. The significant fact remains that Dysart did not regard winds which, if the meteorological data be given weight, were roughly the same as that on August 28 as of a character to elicit notice or comment from him, certainly not to be regarded as tumultuous or extraordinary.

(2) The two employees of the sprinkler company, who came to the warehouse at about 2:30 on the afternoon of August 28 and remained until 5:30 that afternoon, testified that there was "very little, if any, wind", and that there was not any form of storm whatsoever. They positively stated that they observed no wind during the afternoon that gave them any "concern". They did testify that they were concerned upon their arrival by the unsteadiness of the structure and so indicated to the manager of the plaintiff. This testimony of these outside witnesses finds support in the evidence of Mr. Dysart himself, who said his attention was called to the "leaning" of the warehouse by these witnesses.

Mr. Dysart in his testimony sought to minimize the testimony of the sprinkler employees. He asserted that the sprinkler repairmen did not arrive at the warehouse until 5:30 in the afternoon, after the wind had subsided. I am, however, persuaded to give credit to the testimony of the sprinkler repairmen as to the time of their arrival at the warehouse. It would not seem likely that they would be reporting for work at the end of the work-day. Moreover, they testified without contradiction that they were at the warehouse for about "two hours or maybe a little better", engaged in work on the sprinkler system. Yet, Mr. Dysart said he closed up the warehouses and went home about 6:30 or 7:00 o'clock. Under that version, the repairmen could only have been at the warehouse for approximately an hour and could have done little or no work about the warehouse.

I find that the sprinkler repairmen were at the warehouse at the very time

when Mr. Dysart contends the winds were "strong" and "gusty".

(3) The officers of the Greenville Fire Department testified. Some of them had great familiarity with the warehouse in question. They had done some of the repair work in 1950. In addition, they were present at the warehouse immediately after its collapse about 10:30 on the night of August 28. They testified that they had not noted any evidence of unusual wind conditions in the Greenville vicinity on August 28 and that, when they arrived at the warehouse after its collapse, there was at best a slight breeze.

13. I find further that, taking all the evidence into consideration, including both that proffered by the plaintiff and the defendant, there were no winds of unusual violence or tumultuous force—certainly no winds assuming the aspects of a storm—on the afternoon of August 28, 1968.

I find further that there is no evidence of any damage to any other building near that in question. There is no testimony that the wind was of such force that it moved any object near the warehouse. No trees, not even a branch of any tree, near the warehouse were broken. The mere fact that some cotton was seen "blowing" means little; cotton is susceptible to the slightest wind.

14. The warehouse "collapsed" about 10:30 on the night of August 28. The members of the Greenville Fire Department, who came promptly to the scene saw no evidence of any wind damage to any areas about the warehouse. It seems conceded that at that time there were no turbulent winds and that, such wind damage as the warehouse had suffered, had to have occurred during the afternoon of August 28.

15. On the day following the collapse of the warehouse, Mr. Dysart talked to Mr. Gilfillin, who was the agent for the defendant and an officer of the plaintiff. At that time, Dysart made no reference to any wind turbulence and, after telling Gilfillin that the warehouse had "collapsed", inquired whether the plaintiff had any "collapse insurance".

## DISCUSSION

The policy itself incorporates no definition of "windstorm" nor has the South Carolina Supreme Court had occasion to construe the term as used in South Carolina insurance contracts. Its application has, however, arisen in a number of cases in the federal courts of this State[1] and the construction of the term, as it has been enunciated in the decisions generally, has been adopted. In Abady v. Hanover Fire Insurance Company (4th Cir.1959) 266 F.2d 362, 365, Judge Boreman put it:

"The various judicial definitions of the term 'windstorm' all emphasize, exclusively, the violent, turbulent and forceful qualities of the phenomenon. See, for example, Queen Ins. Co. of America v. Larson, 9 Cir., 1955, 225 F.2d 46, wherein it was held that, under such a provision, 'windstorm' means wind of extraordinary or unusual violence, such as that which is capable of damaging the insured property. Another frequently used definition is that 'windstorm', within the meaning of a windstorm policy, means a wind of unusual violence, something more than an ordinary gust of wind or current of air, no matter how long continued, and must assume the aspects of a storm. Metropolitan Ice Cream Co. v. Union Mut. Fire Ins. Co., supra (Mo.App.1948, 210 S.W.2d 700); Jordan v. Iowa Mut. Tornado Ins. Co., 1911, 151 Iowa 73, 130 N.W. 177. See, also, Unobskey v. Continental Ins. Co., supra (1952, 147 Me. 249, 86 A.2d 160)."

In keeping with this statement, a leading text puts it that the term "windstorm" has reference "to a wind of un-

1. Firemen's Insurance Co. of Newark v. Senseney (4th Cir. 1957) 250 F.2d 130; Beaty Shopping Center, Inc. v. Monarch Ins. Co. of Ohio (4th Cir. 1963) 315 F.2d 467; Phenix Ins. Co. v. Charleston Bridge Co. (4th Cir. 1895) 65 F. 628.

usual violence or tumultuous force", Appleman, Insurance Law & Practice, sec. 3142, vol. 5, p. 447 (1970 ed.). In Kemp v. American Universal Insurance Company (5th Cir.1968) 391 F.2d 533, 535, the word was held to encompass wind "of such extraordinary force and violence as to thereby injuriously disturb the ordinary condition of things insured * * *." A number of cases have stated that "a windstorm is a wind capable of damaging the insured property either *by its own unaided action* or by projecting some object against it". (Italics added.) 93 A.L.R.2d 154. To this latter definition, a number of authorities add the qualification that the property must be in a reasonable state of repair. Druggist Mut. Ins. Co. v. Baker (1952 Ky.) 254 S.W.2d 691; Glens Falls Ins. Co. v. Ogden (1958 Ky.) 310 S.W.2d 547; Pearson v. Aroostook County Patrons Mut. Ins. Co. (1953) 149 Me. 313, 101 A.2d 183. This qualification is included in the definition set forth both in 44 Am.Juris.2d sec. 1392, pp. 234–5 and in *Appleman, supra.* However, it is repudiated in Stephens v. New Hampshire Insurance Company (1968) 92 Idaho 537, 447 P.2d 14, 16–17; Great American Ins. Co. v. Railroad Furniture Salv. (1964) 276 Ala. 394, 162 So.2d 488, 493; and New Hampshire Fire Ins. Co. v. Kochton Plywood & Veneer Co. (1961) 242 Miss. 169, 134 So.2d 735. The theory of this latter group of cases is persuasive. Though the building may be of faulty construction, that alone should not relieve the insurer of liability since such construction might be held to be "a preexisting condition, which permitted the extraordinary wind to work its destruction more readily than it might otherwise."[2] However, the nature of the construction and the condition of the insured property is not an irrelevant consideration, a fact the qualification seeks to express. Perhaps the best solution to the dilemma posed by the two lines of authorities is to adopt the very

sensible rule stated in Granger v. Aetna Ins. Co., *supra,* 344 F.2d at p. 943, that, the issue whether the collapse was due to poor construction or decay of the insured property, rather than windstorm should be resolved in terms of whether the building was in such condition as to be "capable of withstanding winds reasonably to have been expected". This accords generally with the statement in the general definition, quoted *supra,* that the wind must be of such force as to cause the damage "by its own unaided action."

Moreover, to a considerable extent, this question cannot be separated from the one of proximate cause. The policy limits the insurer's liability to "direct loss". While that term does not eliminate liability where another factor, such as faulty construction or decay, contributed to the collapse, it is necessary that the windstorm be of such force that it may be deemed the "dominant, and efficient" cause of the building's collapse. As the Court put it in Phenix Ins. Co. v. Charleston Bridge Co., *supra,* 65 F. at p. 632, the windstorm must be "the predominating and efficient cause, the cause which produces the disaster without any new intervening cause, which of itself would have been sufficient to produce the result." The rule adopted in *Granger* harmonizes with this requirement of "predominant and efficient cause".

In determining whether wind reaches such force as is required for finding it to be a "windstorm", the velocity of the wind and damage to adjacent structures or timber have generally been considered. See 93 A.L.R.2d 151–152. In Bogalusa Gin & Warehouse v. Western Assur. Co. (1942) 199 La. 715, 6 So.2d 740, it was indicated, based on some testimony from employees of the United States Weather Bureau, that winds had to reach a velocity of at least 27 miles per hour to warrant the classification of "windstorm". In Clark v. Fidelity &

2. Such a conclusion seems implicit in both Granger v. Aetna Ins. Co. (4th Cir. 1965) 344 F.2d 942, 943, and Beaty

Shopping Center, Inc. v. Monarch Ins. Co. of Ohio, *supra,* 315 F.2d at p. 470.

Guaranty Fire Corp. (1943, City Ct. Buffalo) 39 N.Y.S.2d 377, winds with a velocity of 28 miles per hour while perhaps not, as the Court said, an "aerial lullaby", did not qualify as a windstorm. In *Phenix, supra* (65 F. at p. 630) there was evidence that the winds reached a velocity of 120 miles per hour. In *Granger* (344 F.2d at p. 943), witnesses estimated the wind velocity at 60 miles per hour. In *Abady* (266 F.2d at p. 363), the winds, which it was claimed represented a windstorm, "reached the velocity of 50 miles per hour." In Vestal v. Glens Falls Insurance Company (D.C.N.C.1956) 146 F.Supp. 494, 495, aff. 244 F.2d 78, the winds reached a velocity of more than 100 miles per hour, with gusts of even greater intensity. In Wood v. Michigan Millers Mutual Fire Insurance Co. (1957) 245 N.C. 383, 96 S.E.2d 28, 29, the winds were of a minimum velocity of 40 to 50 miles per hour. In Pearl Assur. Co. v. Stacey Bros. Gas Constr. Co. (6th Cir.1940) 114 F.2d 702, 703–704, there was testimony that the winds reached a velocity from 45 to 65 miles per hour, with gusts up to 75. On the other hand, it was held in Higginson v. Fireman's Fund Ins. Co. (1958) 186 Pa.Super. 650, 142 A.2d 737, that, though the winds reached a velocity of only 22 miles per hour, the Court could not conclude as a matter of law that such winds constituted a windstorm and left the issue to the jury. Generally, too, there are other circumstances that indicate that the wind was of extraordinary force. Thus, in Beaty Shopping Center, Inc. v. Monarch Ins. Co., *supra,* 315 F.2d at p. 469, the wind was of such force that it blew out the glass windows in the store, twisted and tore down the canvas canopies with their metal frames in the nearby cemetery, and concededly did windstorm damage to a house only 500 feet from the building in question.

■ In any event, it is necessary that the windstorm be "the dominant and efficient cause of the damage", though, as has already been observed, "there may have been other contributing causes." Commercial Carving Co. v. Manhattan Fire & M. Ins. Co. (D.C.N.C.1961) 191 F.Supp. 753, 759.

■ It is difficult to conclude, on the basis of the facts established in this case, that the collapse of the warehouse was predominantly and efficiently caused by wind of such force as to warrant the classification of a windstorm. Unquestionably, the warehouse was listing long before August 28. The listing had become progressively worse. The building had evidenced for some time instability when cotton was being moved about by the fork-lifts on the second floor. There were dry rot and termite infestation about the supports. The wind, on the other hand, was not extraordinary or "tumultuous". It assumed none of the "aspects of a storm." In fact, it was so mild that it did not excite the interest or concern of the sprinkler repairmen when they arrived at the warehouse. No witness estimated the velocity of the wind but, if it had been of a "tumultuous" character, there should have been evidence of its force somewhere else in the neighborhood of the collapsed warehouse. Not even a nearby broken tree branch testified to the force of the wind. In fact, Dysart merely characterized the wind as "strong gusts". So far as the Greenville Fire Department knew, there were no extraordinary winds in the Greenville area on August 28. It is true Mrs. Shackelford said that, when she came by the warehouse on the afternoon of August 28, it "was windy" and she did not think "it would be comfortable" to get out of her car. Another witness for the plaintiff testified to fluttering cotton. None of this, however, gives a picture of winds of extraordinary force and it is entirely contradicted by the testimony of the sprinkler representatives, whose testimony there is no reason to discredit.

The plaintiff suggests that its theory that the wind was the "dominant" cause of collapse is supported by the fact that the building fell, not with but against the incline. This, it does not seem to me, is particularly important. The building collapsed, undoubtedly, in the

direction where its supporting beams were weakest or under the greatest pressure. It may well be that this condition was on the side of the incline.

I have not disregarded the fact that the warehouse was accepted in the State Warehouse System, which provides for inspection. The extent of such inspection is not evident in the record. At any rate, the sprinkler representatives had an intimate familiarity with the warehouse over a period of many years. I cannot deny weight to their testimony on the mere assumption of what the State Warehouse Commissioner may or may not have done.

Finally, the plaintiff has cited a number of authorities where it argues the evidence was little more than that here. In such cases, however, the issue was whether there was sufficient evidence to submit the issue of windstorm loss to the jury. Illustrative of these cases is Jay Bee Warehouse Co. v. American Eagle Fire Ins. Co. (7th Cir.1959) 270 F. 2d 883. There the Court said at p. 887:

> "The issues in this case were close. From the evidence the jury might have reached a different conclusion as to the cause of the collapse of 'Building D'. However, our area of review is limited because we are convinced there is sufficient credible evidence in this record to support the verdict and judgment for the plaintiff."

But the question here is not whether to submit the issue of "windstorm" damage to the jury. In this case, the Court is called upon to perform the function of the jury and to determine the issue which, in a jury case, would be the function of the jury. Accordingly, cases which deal only with whether the evidence is sufficient to warrant submission to the jury are inapposite. Westley v. Southern Ry. Co. (4th Cir.1957) 250 F.2d 188, 191; Britt v. Seaboard Coast Line Railroad (D.C.S.C.1968) 281 F. Supp. 481, 483.

To sum up, I find that the collapse of the warehouse in this case was not predominantly and efficiently caused by a windstorm within the coverage of defendant's policy.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. On the basis of the foregoing findings of fact, I conclude as a matter of law that the collapse of the warehouse in this case was not predominantly and efficiently caused by a windstorm within the coverage of defendant's policy. Granger v. Aetna Ins. Co. (4th Cir. 1965) 344 F.2d 942, 943; Phenix Ins. Co. v. Charleston Bridge Co. (4th Cir. 1895) 65 F. 628, 632.

Let judgment be entered for the defendant,

And it is so ordered.